## JOHN S. GRAHAM ET AL. *vs.* PHILIP B. COOPER.

*Liquidated Damages: building contracts.*

By a written contract, a builder agreed to erect and com-
plete a dwelling house for the defendant by the 1st of Sep-
tember of a certain year for a sum named. The house not
being completed on that date, it was agreed between the par-
ties by a supplemental contract that, unless the house should
be completed before the 1st of the next October, the builder
should pay to the defendant as liquidated damages $5.00 a
day, commencing with the 1st day of September, "until the
building was completed and ready for occupancy." *Held,*
that in view of all the facts of the case, and the inconven-
ience that it was known that delay in completing the house
would cause the defendant, the provision should be consid-
ered as in the nature of liquidated damages, and not as a
penalty.                                          pp. 370-371

The fact that the liquidated damages commenced to run from a
date before the day of the breach does not affect the question.
                                                       p. 371

*Decided January 14th, 1913.*

Appeal from the Circuit Court for Anne Arundel County
(BRASHEARS, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., PEARCE,
BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*Frank H. Stockett* and *James M. Munroe,* for the appel-
lant.

*Ridgely P. Melvin,* for the appellee.

PATTISON, J., delivered the opinion of the Court:

The appellant in this case, John S. Graham, a Lieutenant Commander in the U. S. Navy, and the owner of a lot of land at Wardour Bluffs, near the City of Annapolis, entered into a written contract with the appellant, Philip B. Cooper, a builder and contractor of Annapolis, Md., dated the 5th day of May, 1910, by which the appellee was to build and construct for him a frame cottage on said lot of land. By this contract the appellee was not only to do the work, but was likewise to furnish the material to be used in the construction of said cottage. The work to be done and the material to be used were to conform to the specifications thereto attached and made a part of the contract. The house was to be completed not later than the 1st day of September, 1910, at which time, or upon its completion, ready for occupancy, the sum of $4,400 was to be paid therefor to the appellee by the appellant.

Upon the 1st day of September, 1910, the house was not completed and ready for occupancy, and on the 3rd of September following a supplemental agreement was entered into by and between the appellant and the appellee.

By the last agreement or contract the time in which the building was to be completed was extended to the 1st day of October, 1910, at which time it was to be completed and ready for occupancy. But the contract further provided, that should the appellee fail to complete the building at the time named therein, he was to pay to the appellant, as liquidated damages, the sum of five dollars per day, commencing with the 1st day of September, 1910, "until the building was completed and ready for occupation." It was further provided therein, however, "That the said John S. Graham is not to be unreasonable in his interpretation of the phrase 'completed and ready for occupation,' but in matters of trifling moment may accept the said building, occupy the same and retain from the contract price such sum or sums of money as may be sufficient to complete the work in every

detail and particular." In all other respects the original agreement or contract was unchanged and was to remain in full force and effect.

On October 1st, as alleged by the appellant, the building was still unfinished and not ready for occupancy. On October 13th, however, the appellant moved in and occupied the building; at which time, as he alleged, the building was still incomplete and unfinished.

The record discloses by correspondence and otherwise that the appellant was dissatisfied with the work done and material furnished by the appellee upon and in the erection of said house, and contended that the work had not been completed, and after the payment by him, in all, of the sum of $3,955.54, the last payment being made on the 8th day of October, 1910, he refused to pay more so long as the conditions of which he complained continued to exist.

On the 16th day of December, 1910, the balance of said contract price, $444.46, as claimed by the appellee, and the further sum of $25 for extra work likewise claimed by the appellee, not having been paid, the appellee filed his mechanics' lien against said house and lot of land for the sum of $469.46. On the 30th day of December he filed his bill in the Circuit Court for Anne Arundel County for the enforcement of his mechanics' lien claim against the appellant and the "Workingmen's Building and Loan Association of Annapolis, Anne Arundel county, Maryland," a corporation to which the appellant, by deed of mortgage, had conveyed said property to secure a loan from it to him. In his bill he asked for a sale of the property described in said lien, and that the proceeds thereof be distributed to him as lien or under the order of the Court.

The defendant answered the bill, denying the allegation therein contained that the building was erected and completed in compliance with the terms of the contracts and specifications mentioned, and alleged that it was at such time "in an incomplete condition, requiring and necessitating the expenditure of considerable sums of money to make

the same conform to the provisions, requirements and stipulations of said contracts, plans and specifications;" and that such incomplete condition of the building was due to the neglect and failure of the plaintiff to complete the same in accordance with the terms of said contracts, plans and specifications. And in his answer he denied that he was owing unto the appellee the sum of $469.46, as alleged in the bill, but charged that "by reason of his (plaintiff's) neglect, mismanagement and flagrant disregard of the terms and requirements of the said contracts and specifications he has been more than compensated for such work as he has done and materials furnished in and about the erection of said building."

Upon the bill, answer and evidence the Court below granted a decree as prayed, after first having reduced the amount claimed to the extent of $35, of which $25 was for extra work, which the Court held had not been properly proven, and $10 for work that the appellee agreed to do and which was not done. It is from that decree that this appeal is taken.

The appellant contends:

*First*—That by a reasonable interpretation of the phrase "completed and ready for occupation," found in the supplemental contract, the building was not completed and ready for occupancy on the 1st day of October, 1910; and, therefore, by the provisions of said supplemental contract he was entitled to the liquidated damages of $5 for each and every day the building remained incomplete and not ready for occupancy from the said first day of September until it was completed and ready for occupation, which was, as he alleges, not earlier than the 7th day of October, 1910.

*Second*—That the property has never been completed in conformity with the terms and provisions of the aforesaid contracts and specifications, and that the amount required to complete the work in respect to those things which have not been done, and the loss and injury sustained by him by reason of the failure of the appellee to perform the work

that has been done, in accordance with the terms and provisions of the contract, together with the liquidated damages, to which he claims he is entitled by reason of the failure of the appellee to complete the building, ready for occupancy on the 1st day of October, is in excess of the amount of the contract price remaining unpaid; and thus no part of said contract price was, at the time of the filing of the mechanics' lien or now, owing unto the said appellee.

We will first consider the second contention. We shall refer only to such parts of the specifications, which are quite voluminous, as are involved in the contentions as we have stated them.

The specifications first provided that "All work as described herein, or shown on the drawings and any work necessary to the thorough completion of the work so described or shown, is to be executed in the most workmanlike manner, and where work and material are not specially mentioned they are to be of the highest grade and best adapted to the purpose. All materials are to be the best of their respective kinds in ample quantities."

As we have said, the appellant contends that much of the work that was to be done under the contracts and specifications has not been done, and that much that was done was improperly done. In his testimony he names these omissions and defects, some of which are: that the cellar floor was not laid so as to drain to the trap or sink in the center as it was intended, and that when the water was turned on it would run all over the floor before running out through the trap; that the plastering, particularly in the kitchen, was bad; that the pointing up over the doors and windows was of the crudest sort of work; that the floors had not been planed, cleaned and oiled, as provided for in the specifications, even the joints and butts were not planed off except in some cases; that the switches for the electric wiring had not been put in place in three or four rooms; that the correction to be made in the back porch by the supplemental agreement was not made; that the dormer

window on the northwest side of the house was not weather
tight, the rain blew in all around the weather framing and
the wind came through both sides of the dormer, and the
water leaked through into the bedroom below; that the
moulding under the window framing was entirely missing;
that there was no building paper on the side of the dormer
under the shingles; that the chimney of the house leaked
badly; the chimney flashing was not placed properly and
was not made water tight where it joined the chimney; all
along the beams of the pergola nearest the front of the
house the tile on the outside wall had never been covered
with even a sizing or coat of cement in any way, that it
was still exposed to the weather; that the double doors on
the porch fitted so badly that the lock provided for the
door will not reach across the space between the doors
when they are closed; that the flooring is in pieces and
does not reach to the wall, especially in the dining room
under the radiator; the wood work behind the radiators
is not painted; that under the front door threshold there is
a slit three feet long by three-fourths of an inch wide lead-
ing directly into the cellar; that there were leaks in the
cellar on the southwest side and leaks through the steps on
the northwest side.  In addition to these defects, the chim-
ney was built with three flues when the contract called for
four.

George W. Evans, a carpenter and builder, with twenty
years' experience, who had visited the house and inspected
it, was produced by the appellant as a witness and testified
as to the defects named by the appellant in his testimony.
He spoke of the plastering as being an ordinary job, not
what it should be—a first-class job; that it wasn't a sand
finish as he understood such finish; that there were some
very bad cracks and it was not finished smooth, that the sand
would leave the wall, it would rub off as though there was
nothing "to it".  When asked how this defect could be
cured, witness stated that the only thing he knew was to
finish it with water colors, and before doing that to use

glue sizing, that might hold the sand to the wall and stop
the loose sand from falling off. To do this he estimated
the cost at $120 or $125. He also spoke of the leaks
around the windows, the cost of which he said was hard
to estimate, for this, however, he allowed $40. He testified
that there were a great many radiators where the wash-
boards behind them had not been painted; to complete this
work he allowed $5, and for the leak around the dormer
he allowed $5. As to the cellar, he stated there was a good
bit of water in the cellar at the time he saw it; around
the bottom of the cellar wall it was very wet and looked as
though it came in under the end wall. but that he couldn't
say positively, some may have come down the cellar door;
it was difficult to locate where the water came in; there
were two leaks in the cellar; that it was hard to estimate
the cost of correcting these defects, "that it was a hard
thing to get at," but said "I allowed $50 to stop that leak,"
that is, both leaks. He also noted the absence of the push
buttons and electric switches, but as to these he could not
make an estimate. He estimated the difference in the cost
of the chimney with three flues and four flues at $30 or
$35. He also observed the rough casting behind the beam
on the front porch, and estimated the cost of correcting that
defect at $10. He also observed the opening under the
front door, through which, when standing in the cellar, he
could look out upon the Severn river; the cost of curing this
defect, however, he said would be about $2. The change
to be made in the back porch would not cost, he said, over
$10. The work to the cellar floor to make it drain to the
outlet in the center, would, he said, cost about $35. His
attention was then called to the provision in the specifica-
tions which reads: "Flooring: To be clear of knots, holes,
blemishes of any kind, planed, smooth, cleaned and oiled,"
and he was asked as to the meaning of that provision, to
which he replied that by his interpretation it meant that
the whole surface of the floors should be planed, cleaned
and oiled, and that this was not done, some of the high

places and headers had not been struck down. To plane the floors he estimated the cost would be $50. He further testified that the work was not done in accordance with the contract, at least in respect to the defects and omissions stated above by him. He also stated that there were other small things that were not in strict conformity with the plans and specifications; these he did not make a list of and to do so would require him to go over them again.

William H. Gibbs, foreman mason at the U. S. Naval Academy, whose trade was that of bricklayer, stone mason and plasterer, testified, when produced by the appellant, that he examined the premises of the appellant and the plans and specifications under which the house was built; he did not think the plastering a good job, and saw no way to correct the defects but to replaster it, but made no estimate as to what the cost would be to do this. He examined the cellar, saw the defects to which his attention was called, but did not think it was a spring. He construed the provision in respect to planing the floors in the house as meaning that they should be planed all over. The defects in the plastering he thought were not due to the workmanship, but in the manipulation of the material; that it was not done in accordance with the plans and specifications. He said the plastering was faulty in that it sifts sand, that "if you draw your hand over it you can rub sand off the wall, which shows that the material has been killed in the working of it."

The appellee when offered as a witness in his own behalf, when asked whether or not the contract was completed by him in accordance with the specifications, said "I do not know any case where it wasn't. And when asked "Has this contract been finally and fully completed by you in furnishing the work and material in conformity with the terms? He replied "Yes." He with Mr. Graham, the appellant, and Mr. Werntz, early in October, made an inspection of the building, at which time, he testified, Mr. Graham complained of the floors not being planed all over, but he did not recall

any other complaints made at the time by Mr. Graham. "There were other things to which he objected, but he came down to the matter of planing the floors, as I remember. I stated my contract was finished, but he did not settle up with me." He also testified that after the work was completed he made a personal inspection and "found everything in first-rate shape and in good order; I found a few little things which always occur in a new house and which required small alteration." When asked what these small things were, he said he noticed that a window and a couple of gutter hangers were broken; he also noted certain cracks in the plaster, which he said, always occurs in new houses of frame construction; and that was all. All these defects he said could be remedied for about $10.

William L. Marcy, for eighteen years Government Inspector at the Naval Academy, produced in behalf of the appellee, testified that on the day before, at the request of Mr. Cooper, he inspected the house with him, and that after his return he carefully read the specifications. He was then asked, "From your examination of this building in connection with these sets of specifications what did you find?" He replied saying, "The building is in fairly good shape according to the specifications, with the exception of a few little things." When asked about these, he said the plaster in the front hall was bad, in the other parts of the house it was in "Very good shape for that kind of a job." He testified, however, that he did not go into the kitchen; they were at the time cooking dinner. It was in the kitchen that the appellant claims the plaster was in particularly bad condition. When asked what was meant by the specifications in reference to planing the floors, he said, to plane a floor is "simply to buff and knock off the tongue and groove side." He also noticed that "water goes in the cellar when it rains;" he could not say whether the cellar was constructed according to the plans and specifications as he did not have the plans. He thought the job a good one except for the things he had mentioned.

John A. Stokes, a carpenter of Eastport of forty-five years experience and who had worked for Mr. Cooper for the last three or four years, testified that he was foreman in the construction of the house mentioned in these proceedings, and when asked if the carpenter's work upon the building was completed according to the specifications in every particular, he replied by saying, "It might not have been up to the scratch in a few little things," and these, he explained, were all alterations made at the request of Mr. Graham. He further testified that the material measured up to the specifications. He said the floors were buffed, while the specifications called for the floors to be planed.

George Jewell, who did the brick laying and plastering upon this house, testified that it was completed in accordance with the specifications. He also stated that Mr. Graham complained of the condition of the plaster and asked and wrote to him to come and look at it, but he never went but later sent someone who made the necessary repairs. Upon cross-examination, however, he did not know what repairs were made. He said "After the carpenters get done we generally see if there is any pointing up to be done." Mr. Graham, when upon the stand, testified that neither Jewell nor anyone else made any repairs thereto. Jewell also testified that shore side sand and not sharp bank sand was used. as provided in the specifications.

Daniel P. Thompson, a carpenter of Annapolis, testified that at the request of Mr. Stokes, employe of the appellee, he visited the house and premises mentioned in these proceedings and examined the plastering and found it about as you would find in any house built that length of time; it appeared to be in fairly good condition, and thought the plastering for a two coat sand finish job was up to the specifications. He found a little water in the cellar—no puddles. only a little wet; wet where the water ran in from, as he thought. the down spout which had become disconnected.

After the appellant's witnesses had testified specifically to the facts, as we have stated them, in relation to the defects

and omissions complained of Mr. Cooper went upon the stand in rebuttal and denied the testimony of Mr. Graham, the appellant, that the work was not continuously carried on. He then explained the two ways of finishing the job using two coats of mortar, and then said that up to the day when he finished the job Mr. Graham never said a single word in complaint of the plaster taken as a whole; his only objections were to cracks and the pointing up around the doors and windows. This was the full extent of his testimony in rebuttal; he made no denials or references to the specific defects and omissions claimed by the appellant and others who testified in his behalf, to exist in this work. He contented himself with the general assertions or declarations of himself and witnesses that the work was done in accordance with the contracts and specifications but did not enter into any denials or explanations of such omissions and defects pointed out and complained of by the defendant.

On neither of the occasions when upon the stand did the appellee give the meaning, as he understood it, of the provision in the specifications as to the planing of the floors, although nearly all, if not all of the witnesses who testified in his behalf attempted to construe this provision of the specifications. When first upon the stand he spoke of Mr. Graham's having complained to him because he had not planed the entire floor, Mr. Graham contending that such was the meaning of the specifications, and all he said in reply thereto was that he "had finished his contract" and it was not referred to by him at all when he returned to the stand in rebuttal, although Mr. Graham had testified that before the contract was executed he discussed with Mr. Cooper the meaning of this provision of the specifications and explained to him what was meant thereby. Mr. Graham stated that such discussion or explanation arose from the fact that at the home of Mrs. Graham in the preceding summer the same question had arisen in work there done, and that Mr. Cooper understood fully at the time that this was the meaning intended to be given by them to this provision of the specifications.

In our opinion such construction was the proper one to be placed thereon and the one intended by the parties to the contract. The plaintiff not only failed to plane the floors, but also to oil them.

With these facts before us, we can reach but one conclusion, and that is that the work that was to be done under the contracts mentioned has not been completed, and that much of the work done was not in compliance with the contracts and specifications. While the plaintiff and his witnesses say in general terms that the work has been completed in compliance with the contracts and specifications, yet some of them admit that certain defects of a serious character may be found in the work, and they do not deny that the plaintiff has failed to do other important things that under the contracts he was to do. We will here state that we find no evidence in the record to sustain the charge of $25 for extra work.

We will now consider the first contention of the defendant as we have stated it:

By the supplemental contracct, as we have said, the time at which the building was to be completed was extended to the first day of October, and it provided that should the appellee fail to complete the same at such date he was to pay to the appellant the sum of $5 per day as liquidated damages from the 1st day of September until it was fully completed and ready for occupancy. Thus we are to determine whether or not the building was completed and ready for occupancy on said last-named date within the meaning of said contract.

By it the appellant was not to be unreasonable in his interpretation of the phrase "completed and ready for occupation, and from that we understand that although the house was not to be fully completed in every particular at such time, he was to occupy the same if it was in that condition that he could do so with reasonable comfort and convenience; and he was thereby authorized, in the event of his occupying said building before it was fully com-

pleted, to retain from the contract price such sum or sums of money as would complete it.

The appellant in his testimony says the building was completed so it could be occupied on October 7th and not before. Mr. Strange, the painter, testified that he was still painting on the inside of the building when the appellant started to move his furniture in the house, which was about a week before the 13th of October.

The appellee on October 7th wrote the appellant, "My work being completed today," etc. On the same day, and upon the receipt of his letter, the appellant wrote him, "Your note of this date is just received in which you report your work finished. I infer from that that you mean the inside painting around the molding at the bottom of the base board and the pointing up that was agreed upon yesterday. I'll come and inspect the house this afternoon about five-thiry, as you know I am anxious to move in. When your work is completed present yourself with the releases, receipts, quittances, etc., as required in the contract, in Mr. Stockett's office, and I'll meet you there any time tomorrow or next Monday or Tuesday afternoon. We will then make final arrangements and pay you the amount due on the contract after the reservations that I have mentioned to you as due me under the terms of the contract. Now any delay in receiving your money will be due to your failure to be on hand." It was upon the next day, October 8th, that the second and last payment, $2,914.54, was made upon the house.

It is evident in our opinion that the 7th of October was as early as the appellant could, within the meaning of the supplemental contract, have occupied said house. Even at this time the floors were neither planed nor oiled and, as the painter says, they were still painting upon the inside of the house.

But before it can be said the appellant is entitled to the payment of five dollars a day from the 1st day of September to the 7th day of October, it must be determined that

this money to be paid to the appellant is for liquidated damages and not a mere penalty for breach of the contract.

As was said by JUDGE McSHERRY, "The solution of that question, whilst to some extent controlled by artificial general rules which are not wholly in harmony with the ordinary canons of construction, depends in a large measure at least upon the particular facts and circumstances of each separate case." *Willson* v. *M. & C. C. of Baltimore,* 83 Md. 211.

In 30 *Ency. of Law,* 2nd Ed., 1263, it is said: "Because of the difficulty of ascertaining with certainty the damages arising from a failure to complete working contracts within the stipulated time, the parties to such contracts frequently provide for the payment of a specified amount as liquidated damages for failure to perform the contract on time, and the Courts have unhesitatingly upheld and enforced such provisions." *United Surety Co.* v. *Summers,* 110 Md. 117; 13 *Cyc.* 99.

The provision of this contract as to liquidated damages differs somewhat from the cases generally in that the time for which the payments are to be made starts at an earlier date than the day of the breach. The breach in this case occurred on October 1st, but the appellee, by reason of that breach, was to pay five dollars for each day from the 1st of September until the house was completed and ready for occupancy. This fact, however, in our opinion does not affect the character of these payments, they are, nevertheless, to be considered as liquidated damages. This provision in the supplemental contract must be considered in connection with and in the light of the provisions of the original contract, and especially the provision by which the work was to be completed on the 1st day of September.

The appellant stated that his work at the Naval Academy began on October 1st, and he wished to be settled in his house prior to that time. Thus September 1st was the date first fixed for the completion of the house. When the supplemental contract was made on September 3rd, the

appellee stated he could complete the house by September 25th, but he was given to the 1st of October, and was told by the appellant of the importance of its being completed at that time, and if not completed that it would put him to great inconvenience and expense, that it would be necessary for him to renew the rent for the house in which he was then living and to do numerous other things that were necessary to be done at that season of the year. Time was of the essence of the contract, and it was because of the damage that would result to him by a breach of the contract and the difficulty of proving and ascertaining such damages that the payment of these sums was named in lieu thereof. In our opinion, therefore, the appellant is entitled to these liquidated damages as stated in the contract.

The evidence as to the amount of money that would be required to enable the appellant to do the unfinished work upon the house and to correct the defects in the work done by the appellant is, in respect to some of the items named, rather indefinite and general in its character, yet if we take the smaller amount named in such cases, the aggregate amount required to do such work and to correct the defects as shown by the testimony ($357.00), together with the liquidated damages, to which we have said he is entitled, is far in excess of what remains unpaid of the contract price for the construction of the house, and therefore the conclusion may be safely reached that there is nothing owing by the appellant to the appellee under the contract for the construction of said house. We will therefore reverse the decree of the Court below.

*Decree reversed, with costs to the appellant.*