SUMNER A. PARKER ET AL. *v.* TILGHMAN V. MORGAN, INCORPORATED, ET AL.

[No. 30, October Term, 1935.]

8

10

*Decided January 24th, 1936.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Albert C. Ritchie* and *Wendell D. Allen,* for the appellants.

*Thomas M. Jenifer,* with whom were *Fendall Marbury* and *Jenifer & Jenifer* on the brief, for Tilghman V. Morgan, Inc., appellee.

*Edward D. Martin,* with whom was *Alexander Hardcastle* on the brief, for the L. J. Mueller Furnace Co., appellee.

*Albert A. Sapero,* for Robert S. Green, Inc., appellee.

PARKE, J., delivered the opinion of the Court.

Sumner A. Parker and Dudrea A. Parker, his wife, entered into a contract on January 27th, 1932, with the corporation called Tilghman V. Morgan, Inc., to furnish all the materials and perform all the work called for in certain plans and specifications for the erection of a stone dwelling house, with a garage attached, on a tract of land in Baltimore County which was owned by the husband and wife. The materials and labor were to be paid for in cash as the work progressed, and the final payment was to be made thirty days after substantial completion of the work. The contractor began work before the month ended and maintains that it had fully performed, with some agreed changes and alterations in the plans and specifications, the contract by January 26th, 1933, but that, although demand has been made, only a part of the contract price has been paid by the owners. Within

six months after the performance of the work and of the furnishing of the material, the contractor filed in the office of the clerk of the Circuit Court for Baltimore County its claim as a lien on the house, its location, and so much other adjacent ground of the owners as might be necessary for the ordinary and useful purposes of the building. The amount charged to be due is $8,749.30, with interest from January 27th, 1933, less some credits to be allowed on account of payments whose amounts were unknown to the contractor, but which were made by the owners to sub-contractors and materialmen. The amount stated embraces claims of the L. J. Mueller Furnace Company and Robert S. Green, Inc., subcontractors and materialmen, which have also filed mechanics' liens against the property. The Johns Hopkins Hospital acquired a mortgage lien on the land in question on November 3rd, 1932, which was after the contractor had begun the performance of its contract. These statements are an abridgment of the allegations of a bill of complaint filed by the contractor against the owners, their mortgagee, and the two other corporations which have filed mechanics' liens as stated. The bill of complaint is to recover the amount of the contractor's mechanics' lien by a sale, so that the proceeds may be apportioned among the persons entitled to liens according to their respective rights. Code, art. 63, sec. 25.

The claim of the furnace company is $1,879.14, with interest from December 7th, 1932, and that of Robert S. Green, Inc., is for cement, sand, fire brick, flues, tiles and other materials, and the amount due is $2,248.15. The answer of the owners was a denial of any indebtedness to the contractor or subcontractors. With respect to the contractor the defense set up is that it did not perform all the work nor furnish all the materials as it had agreed, but, although requested, had refused performance, and that the owners had, in fact, paid to the contractor a large sum in excess of what it was entitled to receive; and that, because of the damage done to the property of the owners by reason of the negligent and faulty work of the

contractor, it had become liable in damages to the owners in a large sum of money in excess of any rightful demand of the contractor. The owners, also, denied the accuracy of the account in respect of the materials and work furnished, and the prices to be paid, and demanded strict proof of every item of the account.

The answer of the owners to the claim of the L. J. Mueller Furnace Company is in denial of the obligation on the ground that the contract of the owners with the principal contractor was that the last named should install a certain system which consisted of a furnace, "climator," equipment, and appurtenances, and the heating ducts throughout the house; and that the contractor sublet a portion of this work to a subcontractor, who, in turn, sublet the installation of a furnace, climator, and appurtenances to the Mueller Furnace Company, but that, while the equipment had been placed in position for the service intended, it had been so negligently designed and constructed that it had failed to heat the building as had been agreed, but that additional equipment was shortly to be installed, and, until it had been, it would be impossible to determine whether or not the system would supply the premises with heat as had been agreed. The owners further averred that they were already engaged in a litigation on the equity side of the Circuit Court for Baltimore County with the furnace company in reference to the enforcement of this alleged lien, and that the answer of the owners had been filed. The answer of the furnace company to the bill at bar is of the same effect as to this particular allegation, and on February 12th, 1935, the two causes were consolidated as of September 24th, 1934.

The owners denied, in the cause now pending, that Robert S. Green, Inc., had secured a mechanics' lien, on the ground that this corporation was a subcontractor, and did not notify the owners of its intention to claim a lien within sixty days after furnishing or delivering the last materials necessary or proper for their building under the terms of the contract. The answer, also, set out the

payments made, and the credits to which the owners claim they are entitled.

On the same day that the defendants filed their answer they brought a cross-bill against the contractor. The bill proceeds upon the theory that on January 27th, 1932, the parties had agreed, subject to later changes and modifications, in respect of the erection of a dwelling house and garage by the contractor for the owners, and that one of the terms of the contract was that the work should substantially be completed by July 1st, 1932, provided that the owners did not delay the contractor by not supplying the materials which were to be furnished by the owners, but that, without any default on the part of the owners, the contractor did not complete the undertaking by the time agreed, and had not fully performed its contract when the cross-bill was filed, but that the owners, notwithstanding the incomplete condition of the dwelling house, had moved into the same about November 15th, 1932, and had there remained, without an acceptance. The cross-bill of complaint shows that a large sum of money had been paid by the owners to the contractor, but alleged that they were not bound to make the final payment until the contractor had fully performed the contract, and that the contractor was to be responsible for faulty materials or workmanship and was to remedy any defects and respond for damages to other work that might result therefrom and should appear within a period of one year from the date of substantial completion. It was further charged that the contractor had agreed to be responsible to the owners for any damages which might be sustained because of its negligence or of that of any one employed by it.

The cross-bill then avers that the contractor, without any fault on the part of the owners, had been guilty of many breaches. The building had not been substantially completed, although the time for this had elapsed. There were faults of construction, negligence in work, defects in material and disregard of plan and specifications. These and other breaches of the contract were set forth at

length, and their consequences were asserted to be a great loss in damages because of the large expenditures necessary to be made by the owners to complete the building as had been agreed by the contractor, and because of the structural injury caused to the building and to the paintings, furniture, and other personal property of the owners which had been moved into the building. The sum of these damages is charged to be greatly in excess of what the contractor would have been entitled to receive if it had performed the contract as agreed, so that, if credit be given the contractor for all work properly done, the contractor would, the owners claim, still be in debt to the owners in the sum of $20,000 for the net damages sustained by the owners.

The relief asked is that the suit of the contractor to enforce its mechanics' lien be dismissed, and that a decree *in personam* be granted the owners against the contractor in the amount of $20,000, or in such other amount as the court may find would be due the owners by reason of the default of the contractor, and that the owners might have general relief.

The contractor demurred to the cross-bill on the ground that it is so vague, indefinite, and general in its allegations that a more certain and specific bill is required for the defendant to answer. The chancellor overruled the demurrer, and the contractor answered. The contractor's defense is that there was some delay in the completion of its contract because of a failure on the part of the owners to make timely delivery of materials which they had undertaken to supply, and that the owners were either responsible for the delay or had waived it. The answer alleged that the building was substantially completed as agreed in November, 1932, when the owners accepted it, and that some minor alterations and adjustments were later made by the contractor. The contractor further makes a categorical denial of the charges that the buildings were not built in full compliance with the plans and specifications; and that the work was negligently or

improperly done, but affirms that the entire dwelling was erected, except as changed by the direction of the owners, as planned and specified, and in a competent and workmanlike manner, under the personal direction and supervision of the owners and with their express approval. The answer declares that the owners have sustained no loss through any breach of contract or neglect of the contractor, and asserts that the building is of stone which the owners had quarried on their property, and had insisted should be the material out of which the dwelling would be built, although they had been informed by the contractor that the stone was soft, porous, and unfit for building purposes, and that other material should have been obtained. In addition, the contractor was furnished by the owners, for use in the construction, many of the frames and much of the timber, which were not suitable for the purpose to which they were required to be put, and it is to the use of these defective materials, under the direction and supervision of the owners, that the contractor ascribes the faults of which the owners now complain. In particular, the contractor maintains that the leaks which have developed are produced by the rain penetrating the porous stone of the walls, and producing a wet or damp condition that has occasioned the owners the losses of which they complain.

The summary here made of the pleadings reveals the wide divergence of the parties with reference to what occurred in connection with the subject-matter of controversy. Much testimony was taken before the chancellor, who, at the conclusion of the hearing and the argument, passed a decree dismissing the cross-bill of the owners, and sustaining the mechanics' liens of the furnace company in the sum of $1,879.14, of Robert S. Green, Inc., in the sum of $2,248.15, and of Tilghman V. Morgan, Inc., in the sum of $2,053.26, and declaring them paramount to the mortgage lien of the Johns Hopkins Hospital. In the event that the owners should not pay these liens within the prescribed period, the decree provided for a sale by trustees of the building with an allotted

portion of the land necessary for its convenient use. From this decree, an appeal was taken by the owners.

There are certain preliminary matters which may conveniently be considered at the outset. In the first place, the mortgage lien of the Johns Hopkins Hospital is subordinate to whatever mechanics' liens are here found to exist, because the mortgage lien was acquired after the buildings were begun. Code, art 63, sec. 15. In the second place, whatever may be the right of the principal contractor to include in its claim the materials purchased of the subcontractor, Robert S. Green, Inc., and used in the erection of the buildings, the subcontractor is not entitled to a lien because it did not, nor did its agent, within sixty days after furnishing the materials, give notice in writing to the owners or agent, who resided within the county, of its intention to claim the lien. Code, art. 63, sec. 11.

1. The Mechanics' Lien Law provides that "if the contract for furnishing such work or materials, or both, shall have been made with any architect or builder or any other person except the owner of the lot on which the building may be erected, or his agent, the person so doing work or furnishing materials, or both, shall not be entitled to a lien unless, within sixty days after furnishing the same, he or his agent shall give notice in writing to such owner or agent, if resident within the city or county, of his intention to claim such lien." Code, art. 63, sec. 11.

The claimant Robert S. Green, Inc., under a contract with a subcontractor engaged in work in the erection of buildings upon the premises of the owners, furnished sand and cement for use in such work from February 12th, 1932, to January 5th, 1933. The deliveries during this period were numerous and were made according to the requirements of the work. The aggregate of the account was $2,344.71. From January 5th, 1933, no further order was received by the claimant until April 6th, 1933, when the claimant delivered five bags of cement and one-quarter of a ton of sand at a charge for both

items of $3.44. Notice of the claimant's intention to assert a mechanics' lien for the whole amount of $2,248.15 was given in writing to the owners on April 18th, 1933. The notice was confessedly too late to entitle the claimant to a lien for the charges to January 5th, unless the purchase made on April 6th revived the right to a lien by making this later date the one from which the reckoning of sixty days is to be made.

The difficulty in sustaining this contention is that there is no proof on the record that this last order and delivery was under a subsisting executory or incompleted contract. While it is true that work or materials may well be furnished by different workmen by separate deliveries, at varying intervals of time, yet the work done and the materials supplied must be under one continuous contract, in order that the date of the last work done or materials delivered shall be the day from which the period of limitation, within which the prescribed notice in writing shall be given, will be computed. The contract may be express, or it may be implied, but the burden of proof is upon the claimant. *German Lutheran Congregation v. Heise*, 44 Md. 453, 469; *Venable's Syllabus of Law of Real Property* (Brodie Ed.) 277-285; 287-290; *Infra*. There is no testimony of an express contract, but, in its absence, a contract from the beginning that the work or material should be done or furnished, and that the particular work or material was done or furnished with reference to that contract, may be implied from the nature of the account, the time within which the work was rendered or the materials were furnished and the object of the work or the use of the materials, and other evidential circumstances. *Supra*. In this case, the circumstances are not sufficient to gratify the burden of proof. The item relied on was a single order after an interval of ninety days from the last preceding charge. It was followed by no other. Moreover, this isolated charge was after the owners had occupied the residence for over four months, and after the contractor had done all its work of construction. It may be observed that, while the cement was of the kind there-

tofore used, the sand was of a grade which had never before been purchased. There is testimony on the part of the claimant that one of the servants of the contractor, on the day of its delivery, ordered the material and used it on the buildings, but this is not sufficient for the material to be referable to the original undertaking, since the use was by workmen after the erection of the building was at an end and they had left the job, and for the distinct purpose of repairing past defective workmanship. *Hensel v. Johnson*, 94 Md. 729, 736, 737, 51 A. 575; *Brunt v. Farinholt-Meredith Co.*, 121 Md. 126, 88 A. 42; *Dugan v. Howard*, 130 Md. 114, 120, 99 A. 966; *Gill v. Mullan*, 140 Md. 1, 13, 116 A. 563; *Greenway v. Turner*, 4 Md. 296.

In our judgment, the last material furnished was under a separate and distinct order, and its contemplated use was not in the construction but in the repair of buildings which had previously been imperfectly erected; and since these repairs were not sufficient in the aggregate to equal one-fourth of the value of the buildings, the claimant is not entitled to a lien in any amount. See *Shacks v. Ford*, 128 Md. 287, 288, 97 A. 511.

2. Although the claim of Tilghman V. Morgan, Inc., general contractor, embraced the claim of L. J. Mueller Furnace Company for $1,879.14, the latter was entitled separately to file and establish its mechanics' lien, which would be operative and effective no matter what might be the actual result of the lien filed by the principal contractor and an accounting between it and the owners. So, it is necessary that this claim be decided as a distinct controversy. *Treusch v. Shryock*, 51 Md. 162.

Charles J. Everist, the subcontractor who was engaged by the general contractor to install the Mueller-Sturtevant Climator Air Conditioning System for the purpose of heating the buildings to be erected, made a contract with the present claimant, which agreed that it would furnish to the subcontractor, Charles J. Everist, for installation and use in the home of the owners, the materials and labor, at the prices stated, aggregating the total of $1,879.14, as set forth in the bill of particulars, which is a part of the

mechanics' lien as filed. The labor was rendered in connection with the electrical wiring required, and amounted to $66. The sum of $259.43 was for registers and grilles which were furnished as part of the equipment of heat outlets throughout the house, and there was a charge of $9 for copper pipe of a specified size and type. The aggregate of these three items is $334.43, and the residue of the claim, or $1,544.71, is for a furnace, fan, washer, filter, and control, as specified in the contract between the general contractor and the owners. The claimant furnished as agreed all the items of labor and materials which composed its claim. Nor is there any dispute that the necessary papers, notice, and other procedure have all been filed or taken to make the claim of the L. J. Mueller Furnace Company an enforceable mechanics' lien. So, there can be no denial that the claimant is entitled to a minimum lien of $334.43 for the three items mentioned of labor and material provided. The owners, however, contend the lien should be annulled because the furnace and its equipment were inadequate to heat the house to seventy degrees in zero weather.

The record establishes the fact that the heating system installed does not uniformly heat the house to this temperature when the weather is at zero. Furthermore, the representative of the claimant inspected the installation of the system after its completion, and, on December 14th, 1932, certified to the general contractor that the heating system had been properly installed by the subcontractor Everist. It follows that, there having been a proper installation of the other parts of the system of heating, with the mechanical devices provided for the control and regulation of the delivery of the requisite degree of heat throughout the building, any failure of the system must be attributed to the inadequacy of the furnace, and, so, the problem is reduced to the inquiry what warranty was undertaken by the claimant with respect to the capacity of the furnace, with its described equipment, to heat the specified building.

There is no term of the contract by which the owners

were expressly assured that the heating system should meet any prescribed test, but it is conceded that, in the locality where the building is erected, the standard test which is customarily used to determine the adequate capacity of a heating system is the one here asserted. In addition, the claimant was the manufacturer and seller of the goods sold, and knew the proposed use to which the goods were to be devoted, and the service which they were expected to provide. The evidence further established that the owners relied on the skill and judgment of the seller in the determination of the type and capacity of the furnace and its accessories. In addition, the goods mentioned were to constitute a part of an interrelated system of heating in which the claimant had special knowledge and experience beyond any which could be imputed to the owners. Notwithstanding the goods were specified by their trade-name, these circumstances give rise to an implied warranty that the particular furnace and its specified equipment should be reasonably fit to heat the building contemplated at the time of the contract to a temperature of seventy degrees in zero weather. Code, art 83, sec. 36, subsec. (1); and compare subsection (4); *Luria Bros. & Co. v. Klaff,* 139 Md. 586, 593, 115 A. 849; *Hubbard Fertilizer Co. v. American Trona Corp.,* 142 Md. 246, 249, 120 A. 522. Since the owners have kept the goods, they may, by way of subrogation in these proceedings in equity, set up against the claimant any breach of this implied warranty in diminution or extinction of the price. See article 83, section 90, subsec. (1) (a).

The implied warranty is not of absolute capacity, but of being reasonably fit to heat. Furthermore, the building was not begun when the contract was made, so the matter of the warranty had reference to the structure that was to be erected in accordance with the plans and specifications as embodied in the contract with reference to which the claimant executed its contract. So, if the building actually erected was a structure which substantially deviated in any material respect from the structure which was originally contemplated, and thereby rendered necessary

the installation of a furnace of greater capacity in order to produce sufficient heat, there would be no breach of the warranty implied. It is plain that the owners may not change the subject-matter of the implied warranty and enforce the warranty.

The calculations of the heating capacity required were made upon the plans and specifications submitted to the claimant by the owners. They were first made by the local representative of the claimant, and then forwarded to its principal place of business, where the question was again considered, and all the figures verified and checked by expert engineers of the claimant. On a careful analysis, it was concluded that, when sufficient allowance had been made for the heat loss of a structure of the size and arrangement of the building proposed to be built, the heating system must produce 435,334 British Thermal Units per hour. The furnace recommended and installed had a maximum capacity of about 950,000 British Thermal Units per hour, and when operated in connection with the system installed would have a capacity of 650,000 British Thermal Units per hour, or a safety allowance of almost 50 per centum per hour over the minimum requirement. It was the testimony of both of the expert engineers of the claimant that the furnace and its equipment were adequate to heat the building to seventy degrees in zero weather, if the building had been constructed in a proper manner in conformity with the plans and specifications submitted. It was estimated that even in zero weather the plant's capacity was 25 per cent. more than was required to meet the implied warranty. On their part, the owners produced a witness, who had visited the premises and made his investigations in September, 1934, after the owners had occupied the premises for almost two years. His estimate was that, to heat the building as constructed, a capacity of 512,353 British Thermal Units per hour was required to gratify the implied warranty. He further testified the furnace installed had a capacity of 547,200 British Thermal Units per hour, which is in excess of the necessary capacity. He stated

that on looking up the rating of the furnace installed he found it to be given at 954,000 British Thermal Units per hour, which, when subjected to an efficiency discount upon this rating, was reduced to 572,400, which is slightly over 60,000 British Thermal Units per hour more than his estimate of a sufficient capacity to supply the heat expected. In this connection it should be stated that the testimony of the expert for the owners with reference to the distribution and velocity of air through the ducts into the various parts of the house through the grilles and registers has been considered, but, on account of the length of time that had intervened since the installation, and the obviously incomplete, hurried, and inadequate investigation made, without any actual knowledge of the adjustment of the mechanical devices that controlled the flow and distribution of the heated air through the ducts, there is not much evidential value to be accorded his conclusions on the efficiency of the distribution originally provided.

So, without further statement of details and analysis, the deduction to be made from all the testimony of the expert witnesses for the claimant and the owners is that the furnace and its equipment, which were specified and installed, were reasonably fit for the purpose for which they were designed. Hence, there is no breach of warranty by the claimant if the failure adequately to heat the building ultimately erected was either because the structure differed materially from the plans and specifications submitted, or because of a failure to use proper material or reasonably careful workmanship in its construction.

The structural deviations were the closing of a large window in a second-story room and putting in its place a chimney from the same room with smaller windows on either side; and the reduction of the thickness of the insulation in the ceiling of the chapel from the three inches called for in the specifications to the two inches used; the omission to install insulation in some exposed parts of the building; the failure to use sheathing in the

five gable ends of the building and to waterproof portions of the foundation wall. In addition, the use of green timber caused a shrinkage which opened joints between the timber work and the outside stucco of the gable ends. Whether, through the nature of the material used or faulty design or workmanship, there was dampness throughout the structure and moisture or water in parts of the cellar which the claimant could not reasonably be expected to anticipate and allow for in its decision of the nature of the system to be adopted or in its estimate of the heating capacity of the furnace and accessories which would be requisite under a standard construction of an edifice in conformity with the design and specifications submitted. The testimony must be accepted that the conditions which here developed caused material heat leakage, a necessity for a greater volume of hot air, and unfavorable operative conditions which demanded either a different type of heating or a greater capacity than the claimant had any sufficient reason to provide.

The court cannot accede to the argument that the adverse conditions enumerated have been either permanently or temporarily corrected, so as substantially to make the building the one contemplated by the claimant, in its estimate and contract, and, notwithstanding these asserted remedial efforts, the furnace remains inadequate. The facts which lead to the rejection of this contention need not be recapitulated. It is sufficient to state that, in the cross-bill begun in the cause at bar by the owners against the general contractor, and filed so late as December 28th, 1933, and, therefore, speaking as of that date, which is later than any of the asserted corrections of structural defects, the owners, through their counsel, declare, in the present tense in the sixth paragraph, that "* * * * it has been impossible to adequately heat said house." The paragraph from which this excerpt is quoted sets forth in general terms the matters of which the owners complain, and when the whole was read to one of the owners on the witness stand, he stated that it was their answer or cross-claim against the general contractor.

The court is of the opinion that the chancellor was right in sustaining the lien of the L. J. Mueller Furnace Company, which it finds installed what it had agreed in fulfillment of the implied warranty.

The owners had contributed to the delay in the completion of the building, and they make no claim for damages, because the undertaking of the general contractors to deliver possession was conditional on the absence of any act or neglect on the part of the owners that was responsible for it. The owners did, however, take possession of the premises while the general contractor was at work, and began their occupancy on November 15th, 1932. The house is an unusual one. It is built of stone, with tower and five gables, a chapel and cloister, and a garage, and with all of the edifice assembled under a stone roof. Sumner A. Parker, one of its owners, was its architect. Although the working plans were drawn by a third party, the design was the conception of Parker and the contract between the owners and the general contractor specifically designated the architect to be Sumner A. Parker, and in that technical relation, as well as in that of one of the owners, by virtue of a tenancy by the entireties with his wife, the other contracting owner, the parties were bound. While an engineer by profession he took upon himself the duties of an architect, and by the terms of the contract he was given and assumed the general supervision and direction of the construction, with authority to stop the work whenever such stoppage might be necessary to insure the proper execution of the contract, and with the duty imposed to use his powers under the contract to enforce its faithful performance by the contractor and the owners. In the performance of his duties, and the care of his interests, Parker was there daily in the active supervision and direction of the work. He inspected the work as it progressed, conferred with the general contractor or its representatives and exercised such control as was necessary. The owners supplied ninety per centum of the immense tonnage of stone that went into the erection of the building; much timber was cut from the live

oak and the chestnut trees that had died of the blight in the woods on the premises. Soon after they began to live in their new home, the owners moved there their valuable furniture and personal property. Conditions arose from which damages were sustained, and the owners attributed their loss to defects in the material and construction of the building for which the general contractor was responsible. They further charged that their property had not been built in accordance with the plans and specifications. These controversies gave rise to a number of questions. It will save repetition to state them as they will consecutively be considered.

I. The first group of complaints consists of the alleged failures of the general contractor to do things which were required by the contract.

A. The general contractor did not damp-proof with asphalt the exterior surface of the north cellar and walls from floor to grade. The contractor admits this breach, but asserts that it was committed with the acquiescence of the owners. Under the circumstances this position is not tenable, as it rests upon an inference that is in conflict with the direct testimony in behalf of the owners that the contractor's agent had promised that the matter would be attended to when the scaffolding would be taken down after the completion of the superstructure, and that the owners had relied on this assurance.

In the spring of 1933, the owners discovered the north wall was leaking, and in the summer of 1934 dug along its length until the rock ledge was reached about three feet above the line of the cellar floor. A heavy coat of asphalt was then put against the exposed exterior surface of the wall, and since then the wall has been dry to the extent of the application of asphalt, but below that point the wall is damp and during a rain water will come into the cellar. The rock ledge varies, in distance from the face of the cellar wall, from contact to a few inches. The rock would have to be removed wide enough to apply the waterproofing. Rock excavation by the contractor would have been necessary, which would have been at the cost

of removing the same quantity of earth excavation plus ten per centum of this cost. Since the owners have not deemed it expedient to correct the default of the contractor, the contract provides that an equitable deduction from the contract price should be made.

The only testimony on the part of the owners is that of an expert who had quoted to him the specifications with respect to the exterior surface of cellar and walls, and who was then asked what it would cost to do the dampproofing with asphalt, and answered $591. The answer is not definite, as it refers to all the cellar walls, when the south wall is not involved in the controversy. On the other hand, the testimony of the foreman of the contractor, a practical man of experience in such problems, is not much more explicit. He said that it could be done for $50, if the rock were not there, but that he would not give an estimate which would involve the removal of the rock. In his judgment, the way most effectually to accomplish the desired result would be to dig down and clean out, and then use a grout of cement and sand between the wall and the rock at a cost of about $60. The testimony is indefinite, but, even if an exact estimate is not possible to be made on the present state of the proof, the litigation should be brought to an end rather than to incur the expense of remanding the cause for more relevant estimates. So, the deduction allowed to the owners will be $150.

B. The contract required, and the contractor failed to construct, in the cement floor of the cellar, a sump pit, with an agricultural tile drain laid below the cellar's floor. It would seem that the measure of the deduction would be the expense of its installation, which would involve the cutting a trench through the cement, the purchase and placing of the tile, and the replacement of the removed section of the cement floor. The only testimony is that it would cost $218.82, which is allowed. The contractor substituted a different type of drain, which it thought better, but it does not appear that the owners agreed to this.

C. The contractor promised, under the heading of "painting," that "all exterior mill work shall be weathered oak," but the parties agreed on the use of a substance called "min-wax" as a substitute. All the exterior millwork was so finished, except the woodwork which had been removed from an old mansion and placed in the openings for certain windows in the exterior walls of the building. The chancellor struck out the owner's statement that he put the expense of the omission at $75, evidently upon the ground that the witness did not have the requisite testimonial qualification on this point. There is no other evidence which justified a finding in any amount, and this claim must be disallowed. The contractor did not furnish, as agreed, an anti-freeze hose connection on the garage, and the proof is that this default entitles the owners to an allowance of $20 by way of recoupment.

D. There is a controversy in respect to the obligation of the contractor to have sheathed the gable ends, since the plans and specifications do not indicate the use of sheathing for the gables, although a detail for the mill-dressed lumber for the gable windows, which was made after the contract was in force, does call for a construction with sheathing of the gable ends. Upon the assumption that it was the duty of the contractor to sheathe, the owners, after the contractor's obvious omission to sheathe, cannot now successfully maintain that they should be allowed the sum of $2,329, which would be the cost of removing the five gable ends and putting them back with sheathing. The reason of this is plain. In order for sheathing to have been used, it would have been necessary for gauged timber or timber of a uniform dimension to have been supplied in order that the sheathing might be properly affixed to answer the purposes for which it was to be employed. This requisite timber was not to be supplied by the contractor, but by the owners. Instead of furnishing gauged lumber of one and three-eighths inches thickness, as was specified by the detail supplied by the millman, the timber furnished by the owner was not uniform, but of such varying thickness,

in some as much as four and six inches, that it was impracticable to sheathe the gables. The husband was there every day, and the wife frequently while the work was being done. They were responsible for the kind and size of the timber they supplied under the contract. The use to which it was put, and the fact that there was no sheathing to the gable ends, were apparent. What was so evident cannot be denied by those who went there to see. Furthermore, it was the obligation of the husband in the position of architect, which he had bound himself to fulfill, not only to inspect and to know the material and the work as it progressed, but, on the record he appears to have been assiduously attentive. Under these circumstances, the owners cannot let the contractor proceed with the work as the materials provided by the owners necessitated, and later be heard to complain of the natural result of their acquiescence. The item of $2,328 for damages on account of the lack of sheathing in the gables must be disallowed.

II. The second group of complaints embraces those things which the contractor is alleged to have done in an unworkmanlike, inefficient, or negligent manner.

A. Flashings were not carefully adjusted and leaks in a part of the roof required repair. These defects were remedied by the owners at an outlay of $60, which is allowed.

B. The leaks from the defects for which the contractor was responsible caused damages by water stains to a panel of plaster in the library ($50), to the ceiling of hall in second story ($300), and to the dome of tower stairway ($250). The aggregate of these damages is $600, and is chargeable against the contractor.

C. The dampness in the cellar, which is attributable to the defaults of the contractor, in several respects, caused a necessity for a repainting of steel joists in the cellar at an expense of $40.

D. The owners, also, claim damages in the sum of $700 for the failure of the color of the plaster on the walls to match the shade of brown of the sample furnished

by the owners to the contractor. The plaster is satisfactory in body, quality, texture, and surface. Nor is the color a ground of objection. The claim for damages is solely because the shade of brown is not as dark a shade of brown as the sample submitted to the contractor. Because of this difference in shade, the owners claim an allowance of $700.

The alleged breach is of the terms of the contract with reference to plastering. Omitting the immaterial provisions which relate to the application of the first two coats of plaster, and directing our attention to the language which is applicable to the immediate question, the agreement is that the plasterer shall, upon the second coat, "then applying a finishing coat of Rock Wall plaster troweled to a smooth uniform surface. All surface to be approved. * * * "The plasterer shall be required to do all straightening, fill and leveling of surfaces in the second coat, leaving the finishing coat no thicker than required for first class work. Where indicated there shall be a stucco finish. Sample of finish to be furnished for approval."

The owners rely upon this last sentence of the preceding quotation as being an undertaking on the part of the contractor to finish the plaster conformably to the color of the sample submitted to the contractor by the owners. The words make clear that the sample is furnished by the plasterer; and the context makes clear that the sample is to be of the "stucco finish," the subject-matter of the next preceding sentence. It could not reasonably be otherwise, as the two sentences compose the entire section. With more justification the opening clause of the quotation could be resorted to in support of the contention of the owners. Nothing specific, however, appears in that clause in regard to the color of the surface. The qualities mentioned are a smooth and uniform surface, which the owners must approve. It would seem a reasonable construction that the color contemplated was the natural standard color of the plaster applied; and that, if the right to designate a different color had been intended,

that right would be found expressed. In support of this view, there will be found in the contract, in close association with the specification to be construed, the specifications that all wood floors shall be finished with two coats of Minwax, "color as selected by owner," and, again, with respect to the application of zenitherm in the interior tile work, that the language used is, "Color selected by the owner."

What occurred in reference to the color of the plaster is differently recollected by the participants. The weight of the evidence supports the conclusion that several experiments were made with coloring material, and the results were so unsatisfactory that the attempt was abandoned. The plasterer informed the owners that the plaster could not be mixed with a hoe so as to make it uniform in color and to conform to the sample which had been made for the owners by the plasterer; and that to get a specific result in an artificial color it would be necessary to send the sample to the manufacturer and to have it make, by machinery, a consistent mixture of all the ingredients, so that, when delivered for use, the plasterer would have only to combine water with the product and then apply the compound as the final coat. According to his recollection, which is accepted, the plasterer further informed the owners that this specially prepared material would probably cost $700. It is this amount the owners have adopted as the damages sustained, on the theory that the failure of the contractor to obtain this specially prepared material was the amount which the contractor saved by its alleged breach, and should be the measure of the damages awarded the owners.

When the plastering was finished, the owners at first expressed their satisfaction, but, as the plastering dried, the color naturally became lighter, and they attributed this change to the failure of the contractor properly to color the last coat of plaster. Unless the surface of the plastering is painted to match the desired color, the only way it could be obtained would be by removing all the existing plaster, and replastering, and using for the final

coat a specially prepared colored plaster. There is no evidence of the expense either of the painting or of the re-plastering, and on no theory of damages could the cost of the material be a correct measure of damages.

According to the owners' construction of the contract, the contractor did not perform its contract by applying a finishing coat of Rock Wall plaster troweled to a smooth, uniform, and approved surface, as was done, but was required to apply a finished coat of Rock Wall plaster which had been mixed with coloring material so as to produce a smooth, uniform, and approved surface whose artificial color would match a sample of the color approved by the owners. Since the court is of the opinion that the owners are not warranted in charging the contractor with a breach in respect of the color of the plaster, no compensatory damages may be given.

E. The final problem under this grouping is whether the claim of $2,045 on account of the defective construction of the upper part of the tower should be sustained. A massive stone octagonal tower with walls two feet thick at the base to eighteen inches at the top, rose, as a part of the south wall, from the foundation to a point above the ridge line of the roof. The outside width of the tower was about seventeen feet and its height from basement floor to the top of the parapet was between sixty-one and sixty-two feet. The main stairway rose through the interior of the tower to the third floor, and here the interior of the tower was closed by a vaulted ceiling or dome whose periphery was tangent to a horizontal slab eleven feet from the flat roof of the tower. At this point the tower was surmounted and inclosed by a parapet, six feet in height with two openings let down about two feet on each face of the parapet. A square turret seven feet in width, about eleven feet to the square, and with a peaked slate roof approximately six feet in height, was built of stone from the roof of the tower.

The owners complain that the stone work in that section of the tower upward from the point where the slab or platform is in contact with the top of the dome was

seriously defective. Two experts examined this upper section of the tower, including the turret, and testified. Their examinations were made some time after the stone work was done. One of them expressly stated that the workmanship appeared to him to be properly done. After a careful consideration of their testimony in application to the known circumstances, the defects of which they testify must be limited to their opinion that the mortar used was not of the proper mixture or quality and that the joints in the masonry were not adequately filled.

The mortar was mixed on the ground, and the work on the tower was accessible to the husband, and it does not require technical skill either to ascertain whether known proportions of lime, sand, and cement are being used in the mortar or to observe that the joints in the stone work are not being filled. The construction of the upper section of the tower was not built in a day, and the testimony on the part of the owners is not of occasional neglect, but of a systematic breach throughout a period, since a large and definite portion of the tower is asserted to be uniformly defective for the same defects. However, it is not impossible that during the time the causes of the defects mentioned, and the fact of their existence, were successfully concealed or unobserved, and, if so, the owners are not to be denied their complaint, since the testimony given by the husband is to the effect that these defaults were latent, and, therefore, were not discovered by the owners until quite a while after the work was done. The mixer of the mortar and the foreman of the contractor both testified that the mortar was of the quality prescribed and its composition in the proper proportions. With this conflict of proof the burden of proof becomes material.

The contractor filed its mechanics' lien on the theory that he was entitled to recover the contract price because of a substantial performance of its undertaking, and the burden of this proof is upon the contractor to establish this performance, and this burden does not shift. It is

met by the evidence which the contractor introduced that the contract had been performed according to its terms; and that the owners had accepted possession of the residence before some of the finishing details, which were later completed, had been done, and, after this occupancy, had made several substantial payments on account of the contract price before the owners had expressed any dissatisfaction with the performance of the contract. By this proof the contractor met the burden and was entitled to a decree on the theory of substantial performance, and the obligation of going forward with testimony to establish their defense then shifted to the owners. In compliance with this duty, testimony was offered by the defense, which, if true, tended to prove that there had been breaches of contract or failure to perform as agreed, and, thereupon, the duty of going forward with the testimony passed back to the contractor, which should have had the right to offer testimony, if it could, to disprove or avoid the testimony on the part of the owners by way of defense. Thus the burden of proof of a substantial compliance ever remained upon the contractor, notwithstanding the shifting from one side or the other of the duty to go forward with the testimony.

In the state of the proof when the cause was submitted to him, the chancellor found that, notwithstanding there were breaches in minor matters for which compensation could be ascertained and awarded, the contractor had established by a preponderance of the testimony that the contract had been substantially performed by it. The chancellor not only heard the proof in court, but, during its course, went upon the premises with the parties and their counsel, and made a thorough examination of the building and premises. In view of this advantage, and the circumstances and facts which appear on the record, the court here finds itself in agreement with this conclusion of the chancellor. The effect of this finding is a determination that the contractor has met the burden of proof with respect to a substantial performance, and thereby has cast upon the owners the bur-

den or duty of going forward with the proof of the alleged breach and the damages to the owners that may have been caused as a consequence.

Although there was much testimony to the effect that the stone used was porous and permeable by water, and that the upper section of the tower had been damp and wet from November, 1932, when the owners assumed exclusive possession of the premises, until September, 1933, which is the earliest time that either one of the experts, who testified for the owners, had examined the tower, the owners offered no testimony to show that there had been no intervening change of condition that might have caused the mortar to disintegrate or to be displaced, without any defect in material or in workmanship. The winter of 1932-33 had passed before the investigation by the expert in 1933; and a second winter passed before the second expert looked at the tower. These circumstances somewhat lessen the weight of the witnesses who unqualifiedly stated that the conditions which they found in the fall of 1933 and of 1934 were due to the bad workmanship or material of the contractor in the spring of 1932.

Both of these experts expressed the opinion that the upper section of the tower would have to be torn down a distance of fifteen or eighteen feet and then be rebuilt. One of them estimated that this would cost $2,045. There is no evidence that any part of the section is out of alignment or is displaced, cracked, or in danger of falling. So, the court cannot find any justification for such a drastic method of repair. On the contrary, it is of the opinion that all that is required to make the tower as it was agreed that it should be is to have the interstices and joints filled with the proper mortar. Since it was the duty of the owners to furnish testimony of what that cost of repair would be, or some evidence by which it could be found, and they have not done so nor offered any relevant testimony in reference to what the court conceives to be the true measure of damages for the particular breach now under discussion, the owners have

failed in their burden to go forward with relevant testimony in respect of a matter which was peculiarly within their knowledge, and the court cannot invoke speculation to supply a deficiency in proof. 1 *Poe, Pl. & Pr.*, sec. 615; *Brooke v. Quynn,* 13 Md. 379, 389-391; *Turner v. Diaper,* 2 Man. & Gr. 241, 133 English Reprint, 736; *Sedgwick on Damages* (8th Ed.) vol. 1, sec 170; *Fitts & Co. v. Reinhart,* 102 Iowa, 311, 71 N.W. 227. See *Graham v. Cooper,* 119 Md. 358, 372, 86 A. 991.

In this connection, the owners argue that, where a suit is founded upon the theory of a substantial performance, the contractor is under the burden of proof to show the amount of the deductions to be allowed on account of the defects or omissions in the performance of the contract. The owners cite in support of this contention the cases of *Spence v. Ham,* 163 N.Y. 220, 57 N.E. 412; *Cawley v. Weiner,* 236 N.Y. 537, 140 N.E. 724; *Roberts v. Sinnott,* 55 Mont. 369, 177 P. 252; and these cases from the appellate courts of Texas: *Atkinson v. Jackson Bros.* (Tex. Com. App. 1925) 270 S.W. 848, 38 A.L.R. 1377; *Sloan Lumber Company v. Davis* (Tex. Civ. App. 1929) 19 S.W. (2nd) 355. The citations of the Texas decisions have their weight lessened by the later decision of *Dupuy v. Shilling* (Tex. Civ. App. 1930) 27 S.W. (2nd) 323, in which it was expressly held that the burden of proof was upon the owners to plead and prove the deviations and defaults, and the earlier case of *Harrop v. National Loan & Inv. Co.* (Tex. Civ. App. 1918) 204 S.W. 878, 883, was given as a precedent for the ruling. The cases cited rely upon *Spence v. Ham, supra,* as authority. In that case one of the six judges who sat dissented on the point here involved, but the later case of *Cawley v. Weiner, supra,* leaves no doubt that the rule is well established in New York. In the case last mentioned, however, the complaint did not allege complete performance, but substantial performance, which was an admission of a known default, as was the case in two other cases. *Elgar v. Newhall,* 235 Mass. 373, 126 N.E. 661, and *Morris v. Hokosona,* 26 Colo. App. 251, 143 P. 826, 828.

In none of these cases was there a cross-bill by the defendant for the purpose of recouping the damages sustained by the failure of the plaintiff to perform his contract. By the bill of complaint at bar the contractor brought its suit on the averments of a full performance of the contract, and, thereupon, the owners answered in denial. They, also, filed a cross-bill, which alleged that the contractor had not performed its contract, but had breached the contract in so many wrongful acts of omission and commission that the damages to the owners which had flowed from these breaches were so greatly in excess of what the owners rightly owed to the contractor that the contractor was indebted to the owners in the sum of $20,000, for which the cross-bill prayed a decree *in personam* against the contractor. The motive for the cross-bill lay in that if the owners had merely relied on recoupment, they could have accomplished no more than an elimination of the claim of the contractor, but, if the owners desired affirmative relief for any amount in excess of what would extinguish their debt to the contractor, resort must be had to a cross-bill in order to get a decree *in personam* against the complainant in the original bill. *Cramer v. Baugher,* 130 Md. 212, 219, 100 A. 507; 18 *R.C.L.,* p. 981, sec. 124. Under the pleadings the owners had assumed the affirmative in reference to the matters in recoupment. So, the facts of the pending case differentiate it from those the owners have cited, and render them less persuasive as authority for the abandonment of an established rule in this jurisdiction. It has long been held and enforced by this tribunal that the burden of proof is upon the party who, in a proceeding to recover on a contract, relies upon matters of recoupment as a part or complete defense. 1 *Poe, Pl. & Pr.,* sec. 616; *Abbott v. Gatch,* 13 Md. 314 332, 333; *Iron Clad Mfg. Co. v. Stanfield,* 112 Md. 360, 382, 76 A. 854; *Warfield v. Booth,* 33 Md. 63, 72-74; *Doggett v. Tatham,* 116 Md. 147, 152, 81 A. 376; *Sullivan v. Boswell,* 122 Md. 539, 553, 89 A. 940; *Impervious Products Co. v. Gray,* 127 Md. 64, 68, 96 A. 1. See *Aitz Chaim*

*Hebrew Congregation v. Butterhoff,* 141 Md. 267, 279, 118 A. 658; *Turner v. Eagan,* 116 Md. 35, 38, 81 A. 877; *Harman v. Bannon,* 71 Md. 424, 428, 18 A. 862; *Winder v. Caldwell,* 14 How. 434, 14 L.Ed. 487; *Phillips on Mechanics' Liens* (3rd Ed.) sec. 441; 18 *R.C.L.,* p. 987, sec. 132; *Sutherland on Damages* (4th Ed.) sec. 188; *Chinigo v. Ehrenberg,* 112 Conn. 381, 152 A. 305; *Tate-Jones & Co. v. Union Electric Steel Co.,* 281 Pa. 448, 126 A. 813; *Noar v. Gill,* 111 Pa. 488, 4 A. 552 (mechanics' lien); *Walsh v. North American Cold Storage Co.,* 260 Ill. 322, 103 N.E. 185 (mechanics' lien); *Lane v. F. S. Miller Lumber Co.,* 101 Okl. 14, 222 P. 968; *Asnon v. Foley* (1930) 105 Cal.App. 624, 288 P. 792 (mechanics' lien); *Leeds v. Little,* 42 Minn. 414, 44 N.W. 309 (mechanics' lien); *Avery v. Burrall,* 118 Mich. 672, 77 N.W. 272. See *Johannes v. St. Regis Realty* etc., Co., 196 Mo.App. 43, 188 S.W. 1138, 1140 (mechanics' lien).

It follows as a necessary result of this discussion of the authorities that, even upon the assumption that there was a defective condition in the upper section of the tower for which the contractor was responsible, the owners have failed to establish with a reasonable degree of certainty the amount of the loss, and no amount can be allowed by way of recoupment. The claim of $2,045 to reduce and rebuild the upper section of the tower must be rejected.

III. The third group of complaints embraces certain consequential damages to specified furniture, prints, and paintings which are alleged to have been caused as a direct result of the defaults of the contractor in the construction of the house.

The owners offered testimony which tended to establish that valuable antique furniture and fifteen paintings and ten prints were damaged by dampness, and that it would cost $793.50 to repair the thirty-five pieces of furniture and $4,025 to restore the paintings. For these consequential damages, which amounted to $4,818.50, the contractor denies all responsibility. It maintains that what caused the injury here complained of was the con-

dition of the residence at the time the damages complained of occurred, and that this condition was occasioned by the dampness incident to every new building, by the porosity of the stones and by the defects in the quality of other material which were all furnished by the owners, and, principally, by the owners moving the articles of personal property mentioned into the house when it was not in a suitable state for their housing. The residence constructed was a massive edifice of stone, with a roof of the same material. The walls were two feet or eighteen inches in thickness. All the work was new and the plastering and some other work were being finished, and twenty windows of the gallery for the paintings and other objects of art had not been placed, when the owners occupied the building on November 15th, 1932. These windows were installed in December, and until then the openings were protected by a covering of cheese cloth. The furniture, the paintings, and other examples of art were stored or placed or hung during these two months, although the owners were warned of the risks they would incur because of the dampness which would obviously prevail because of the conditions mentioned. The contractor is not responsible for defects in plans and specications, nor for the building material supplied by the owners. Neither is he liable for the natural dampness of a new house. *Roberts v. Sinnott*, 55 Mont. 369, 177 P. 252, 253; *Filbert v. Philadelphia*, 181 Pa. 530, 37 A. 545. The court is of the opinion that the damages were due to a dampness which was incident to conditions for which the contractor was not responsible, and to the voluntary assumption of this known risk by the owners. The record does not contain testimony which, in its opinion, would warrant a finding that the proximate cause of the injuries now being considered could be attributed to any default of the builder. Where loss has been caused wholly or chiefly through the voluntary act of the owners, and did not necessarily follow from the acts or omissions of the contractor, the damage is evidently too remote, since it cannot be regarded as the necessary result of a

breach by the contractor. *Wood's Mayne on Damages*
(10th Ed.) 75. See *Lawson v. Price*, 45 Md. 123, 136,
citing *Loker v. Damon*, 17 Pick. (Mass.) 284.

The $4,818.50 claimed by the owners for consequential
damages cannot be allowed.

IV. The last group comprises certain items, which
were: (a) Either for work done by the contractor that
was not specifically included in the contract; (b) or for
work or material which the contractor was relieved of
doing or supplying; or (c) for overcharges on account
of additional work.

(a) These items have all been scrutinized. In the
contractor's bill of particulars the additional charges
were set out in seventy-seven numbered explanatory para-
graphs. Of these twenty-three are objected to on the
ground of mistake, excessive charge for time of the
workmen, or of duplication, and of being a charge for
which no written order was given, or of being a charge
for what the contractor was bound to do by the contract.
The particular reason for every ruling will not be set
forth, but the conclusions of the court will be stated.
Account No. 1 for excavation is reduced to $117. Accounts
Nos. 35, 51, 52, 53, 60, 61, 63, 64, 65, 67, 68, and 70, were
disallowed, making a total, with No. 1, of $901.93.

(b) The credits claimed for things omitted amounted
to $935.71, but the items for $20.96 and $795 are rejected
and the residue of $119.75 is allowed as a credit.

(c) The ten per centum overcharge on quoted price
items is $235.11, and on charges disallowed is $90.19.

No question of importance remains, and the opinion
cannot be extended by further discussion. It should be
noted, however, that one of the difficulties in the claim of
the owners for consequential damages to furniture, paint-
ings, and other goods and chattels is that the land is
owned by them as husband and wife, but the evidence
does not establish how the personalty that was injured
was held. The point is mentioned so that it may not be
regarded as immaterial, because of the fact that, in dis-
posing of the case, the court has assumed the husband

and wife hold the personalty by the same title as they own the land. The assumption was made because, in the view the court has taken of the record, the character of the ownership was not material.

### RECAPITULATION.

| | | | | |
|---|---|---|---|---|
| Contract price | | | | $45,000.00 |
| Roofing | | | | 200.00 |
| Charges for additional work and materials furnished, with 10% added as was agreed | | $ 7,420.47 | | |
| Deductions to be made in accordance with opinion: | | | | |
| Work and material | $ 901.93 | | | |
| 10% overcharge on prices quoted | 235.11 | | | |
| 10% overcharge on items disallowed | 90.19 | 1,227.23 | | 6,193.24 |
| Total | | | | $51,393.24 |

#### Credits

| | | |
|---|---|---|
| Payments on contract | $37,000.00 | |
| Paid by owners for windows | 1,588.25 | |
| Credits on account of agreed omissions of work and material and payments made by owners to materialmen and sub-contractors | 5,282.92 | |
| | $43,871.17 | |

#### Additional credits

| | | | | |
|---|---|---|---|---|
| Amounts allowed by opinion for minor omissions and damages caused by neglect in workmanship | | $1,088.82 | | |
| Credits for additional omissions as agreed | | 119.75 | | |
| Amounts paid to materialmen and sub-contractors by owners | $5,983.97 | | | |
| Less amount credited by contractors to owners | 4,509.72 | | | |
| Due owners | $1,474.25 | 1,474.25 | 2,682.82 | 46,553.99 |
| Net amount due contractors | | | | $ 4,839.25 |

Of this amount of $4,839.25, Tilghman V. Morgan, Inc., contractor, is entitled to a mechanic's' lien in the sum of $2,960.11 with interest from May 18th, 1933, and the L. J. Mueller Furnace Company, subcontractors, is entitled to a mechanic's lien in the sum of $1,879.14, with interest from April 18th, 1933. The mechanic's lien claimed by Robert S. Green Co., Inc., is rejected and must be annulled. The cross-bill of the owners is dismissed, as the chancellor decreed below, the owners having failed to establish a right to a decree against the contractor.

The conclusions of the court agree in part and disagree in part with the decree of the chancellor, and the cause must be remanded for a decree in conformity with this opinion and for such further proceedings as may be required.

> *Decree affirmed in part and reversed in part, and cause remanded for a decree in accordance with this opinion and for such further proceedings as may be necessary, with the costs to be paid in the following proportions: One-fourth of the costs by Robert S. Green, Inc., appellee, and three-eights thereof to be paid by appellants, and the remaining three-eighths to be paid by Tilghman V. Morgan, Inc., appellee.*