885 A.2d 826

## L.W. WOLFE ENTERPRISES, INC.,

v.

## MARYLAND NATIONAL GOLF, L.P.

### No. 01858, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Nov. 3, 2005.

340

---

Jeffrey S. Rosenfeld (Adam C. Harrison, on brief), Towson, for appellant.

Scott D. Miller, on brief, Frederick, for appellee.

Panel HOLLANDER, SHARER, PAUL E. ALPERT (Retired, Specially Assigned) JJ.

ALPERT, J.

This is an appeal from a judgment of the Circuit Court for Frederick County (Adams, J.) denying a petition for mechanic's lien for work performed on a cart path of a golf course.

In 2000, appellee Maryland National Golf, L.P. sought to begin development of what would become the Maryland National Golf Club. It signed a contract with Furness Golf for the construction of the course itself, and other contracts for other aspects of the club's construction, such as the buildings thereon. Included in the Furness contract was the construction of an asphalt path along the course for use by golf carts. Furness subcontracted the construction of that path to Craig Sealing. Craig began work, but was dismissed shortly before the club's grand opening in June 2002. Some time after the club opened, excessive wear on the path was noticed by club personnel. An engineering survey was done by Triad Engineering, which found that although drainage issues caused part of the wear problem, the majority of the problem was due to that fact that most of the path was not built to specification. To remedy that fault, in April 2003, Furness contracted with Appellant L.W. Wolfe Enterprises, Inc. ("Wolfe") to re-lay the path. Wolfe began the work in April, and was finished with the majority of it by July 2003. When it did not receive what it regarded as due and timely payment, Appellant filed notice of intent to seek a mechanic's lien against the entire golf course.

In November 2003, Appellant Wolfe, a contractor, filed a complaint against Furness Golf and Maryland National Golf, L.P., relating to work Wolfe had performed on the Maryland National Golf Club. On January 21, 2004, after a show cause hearing, Appellant was granted an order establishing an interlocutory lien against Maryland National Golf's property. Furness failed to respond and both Wolfe and Maryland National were granted default judgments against Furness.

On September 1–2, 2004, the remaining parties tried Appellant's remaining claim seeking a mechanic's lien against Maryland National's real property. After a two-day bench trial, the court ruled that Appellant was not entitled to a mechanic's lien on Maryland National's real property and terminated the interlocutory order to that effect. Appellant timely filed notice of this appeal.

## Questions Presented

I. Did the trial court err in determining that the work done on the Maryland National Golf Club cart path by Wolfe was repair, rebuilding, or improvement rather than new construction for purposes of § 9–102(a) of the Maryland Mechanics' Lien Law?

II. Did the trial court err in determining that the "... 15 percent of its value ..." requirement in § 9–102(a) should be determined with reference to the entire golf course, not just the value of the cart path?

We answer in the negative and affirm the judgment of the trial court.

## Standard of Review

Because the trial below was a non-jury trial, our standard of review is governed by Maryland Rule 8–131. *Boyd v. State,* 22 Md.App. 539, 323 A.2d 684, *cert. denied,* 272 Md. 738 (1974). That rule provides that this Court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "If there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *Yivo Institute For Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005).

Moreover, "[u]nder the clearly erroneous standard, this Court does not sit as a second trial court, reviewing all the facts to determine whether an appellant has proven his case." *Lemley v. Lemley,* 109 Md.App. 620, 628, 675 A.2d 596 (1996). Our task is limited to deciding whether the circuit court's factual findings were supported by substantial evidence in the record: "The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." *GMC v. Schmitz,* 362 Md. 229, 234, 764 A.2d 838

(2001) (quoting *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975)).

Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not. " '[T]he clearly erroneous standard for appellate review in [Maryland Rule 8–131] section (c) ... does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact.' " *Ins. Co. of N. Am. v. Miller,* 362 Md. 361, 372, 765 A.2d 587 (2001) (quoting *Heat & Power Corp. v. Air Prods. & Chem. Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990)). Instead, "... where the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609 (2002).

Appellant contends that the question of repair versus new construction was in fact a conclusion of law based on findings of fact, not simply a question of fact. Therefore, Appellant argues that it should be reviewed under a stricter *de novo* standard for legal correctness, rather than using the "clearly erroneous" standard applied to findings of fact. We do not agree. Appellant cites *Helinski v. Harford Memorial Hospital, Inc.* 376 Md. 606, 831 A.2d 40 (2003), to support this claim. A reading of the text of *Helinski,* however, indicates that the Court there was making an independent determination of a disputed matter of law previously decided by the lower court: at what point in the process of serving a lien does that lien sever the unity necessary for a joint tenancy. The lower court had found that it occurred when the notice of lien was given to the sheriff for service on the property; the Court of Appeals determined after its *de novo* review that the law dictated that the severance occurred when the sheriff served the notice.

Having reached a different conclusion of law, the Court of Appeals then applied to that result the same factual determination from the lower court of when the various steps in the

lien process were carried out. Thus, its resolution of the disputed point of law determined which facts were dispositive. Here, the lower court made no such determination of law. To use the language from *Helinski* quoted by Appellant, there were no "determinations of legal questions or conclusions of law based on findings of fact." *Id.* at 614, 831 A.2d 40. Here, there was simply a finding of fact. The lower court's determination of whether Wolfe's work was repair or new construction was purely based on the facts presented to it.

Neither the transcript of the September 24 proceedings in which the judge made her determination, nor the subsequent written order, contain any reference to determining any points of law regarding repair vs. new construction. On the contrary, at the hearing, Judge Adams referred exclusively to the contents of exhibits and testimony when discussing her finding that the work was repair, in contrast to her discussion of whether paving work was lienable, in which she did discuss precedent. The lower court therefore applied the law in this matter—it did not interpret it. As such, the "clearly erroneous" standard is indeed the correct one and we will use it here. The second question—what to measure the value of repairs against—is, on the other hand, clearly one of legal interpretation, and we will therefore apply the *de novo* standard of review to it.

### Discussion

#### I

■ Wolfe argues that, because Craig Sealing never completed the paving work in question, that the subsequent work done by Wolfe must be viewed as part of the original work on the golf course, not as a repair or improvement. The contractor Furness wrote to Craig Sealing on May 28, 2002, stating: "You have left me no option other than to find another means by which to complete the cart path work . . ." In a response to a petition by Craig Sealing for a mechanic's lien, Maryland Golf stated under oath in December 2002: "As a result of [Craig's] faulty, defective, and incomplete work, [Maryland National] will be forced to spend an excess of $70,000 to have

the defective and incomplete work corrected and/or completed."

Appellant argues that this statement by Maryland National under oath should estop it from later claiming the work in question was repair rather than completion. However, the affidavit in question clearly refers to both "faulty and defective" as well as "incomplete" work, and envisions correcting *or* completing it. Further, even if the paths had been incomplete in some fashion, it would still be possible that the work Wolfe was contracted for was to repair the faulty and defective aspects of the paths, not the incomplete aspects. Moreover, the contract between Furness and Wolfe is clearly labeled as being for "remediation and overlay," and a January 2003 letter from Furness to Wolfe initiating the work says that the project was "... made necessary by the failure of the cart paths ..."—not by their incomplete status. An October 2002 letter from Maryland National to Furness discussing the timing of Wolfe's work refers to it as "restoration and remaining warranty repairs."

On September 24, 2004, the court below issued a ruling denying the lien, finding that the work to the golf course was repair and that it did not meet the 15 per cent threshold for repair value to merit a lien. On the first issue, the court first noted the contract, under its "scope of work," called for "Remediation and overlay of failed cart paths indicated on attached ...", and also noted that the requirement in the contract that "all reasonable steps shall be taken in the performance of the work so as to avoid interference with the members and customers of the Golf Course." The court went on to say, "This Golf Course was opened for bus [sic], grand opening July, excuse me, June 28th, 2002. It's clear to the court from the testimony, mostly from Mr. Plummer, that work had to be done to keep it from interfering with the people who were already using existing golf cart paths." The court then went on to cite the documentary record, including a change order referring to "reconstruction", a letter from Wolfe's lawyer to Maryland National dated October 23, 2003, citing "remediation and overlay," and Triad's proposal to

Furness for its inspection work, dated August 9, 2002, which says that "an obvious trend of deterioration of existing golf cart paths is occurring." Triad's proposed Scope of Work then goes on to say: "We propose to evaluate the condition of the existing asphalt golf paths."

The court might also have noted that the contract proposal from Wolfe, which Triad accepted, was for "Reconstruction of failed cart paths, including excavation and removal of asphalt surface, stone, base, and earth subgrade ... and rebuild." Moreover, a letter to Furness dated June 24, 2003, stating in part, "As you know, Maryland National has been advising their customers about the cart path work and has also been roping off construction areas to keep golf carts away from operations." The letter continued: "[W]hen we originally quoted this job, we figured an average of two turnaround locations per hole. Maryland National has not allowed that because they didn't want to disturb, and then repair, so many locations." The previous subcontractor, Craig Sealing, provided notice of its intent to file a mechanic's lien on August 22, 2002, saying "the work done or material furnished under the sub contract were as follows: consisted of road and path grading and construction, including provision of necessary products and services."

Although not exactly on point, the case of *Parker v. Tilghman*, 170 Md. 7, 183 A. 224 (1936), is instructive. There, a contractor who had been furnished sand and cement during the period of construction was later asked to make a separate and additional delivery "... for use by workmen after the erection of the building was at an end ... and for the distinct purpose of repairing past defective workmanship." (Note that the workmen's use of the sand and cement was defective; the materials were not.) *Parker, supra,* 170 Md. at 20, 183 A. 224. The two cases can be distinguished by the fact that the faulty work done in *Parker* was not that of the contractor in question, so the plaintiff cannot be seen as merely completing its own previous obligation, or even the obligation of another for which it was substituted as is the case here. Nonetheless, it does stand for the principle that at some point after construc-

tion stops and use of the building begins, further work constitutes repair, even if it is repair of sub-standard original construction.

We see no error in the trial judge's finding that the work in question was repair rather than new construction. Viewing all the evidence in the light most favorable to the prevailing party below, the circuit court's finding was not clearly erroneous. The work was a repair.

## II

■ The second question presented hinges on the phrase "... every building repaired, rebuilt, or improved to the extent of 15 percent of its value ..." in the Mechanics' Lien Law. Md.Code (1974, 2003 Repl.Vol.), § 9–102 of the Real Property Article. Specifically, the parties dispute how that 15 per cent should be measured—is it 15 per cent of the value of the cart path as appellant asserts or 15 per cent of the value of the entire "building" whose premises have been improved, as Maryland National asserts? The answer requires a determination of what value the 15 per cent must be set against, as well as whether the plaintiff has shown that value to be met, and as such is a mixed question of law and fact. Under the standard noted above from *Walter v. Gunter,* 367 Md. at 392, 788 A.2d 609, this Court accepts underlying factual findings unless clearly erroneous, but makes its own determination whether the application of the law to that finding was "legally correct." *See, e.g., Garcia v. Foulger Pratt Development, Inc.,* 155 Md.App. 634, 654, 845 A.2d 16 (2003). In this case, it was.

Appellant argues that the 15 per cent measure should apply to the cart path itself, as the path is paving, which is a lienable structure under the statute. Without addressing specifically whether the path can be a lienable structure, appellee argues that the 15 per cent must be measured as a percentage of the "building" against which the lien is sought—in this case, the entire golf course. Appellee argued that, having sought a lien against the golf course as a whole, the 15 per cent of value must be measured against the value of the course. The trial

court ruled for appellee, and we agree that the reference to "premises" in the text of the law means that the value of the paving is not the correct measure for the 15 per cent value; rather it is the entire premises on which the paving took place.

Appellant has sought a lien against the entire golf course. The structure of the statutory language makes clear that the 15 per cent measure must be applied against the thing upon which the lien is sought. The 15 per cent is of "its" value, and the antecedent to "its" can only be the ". . . building repaired, rebuilt, or improved . . ." This is the same building that the law makes ". . . subject to establishment of a lien . . ." The text of § 9–102(a) mandates such a reading; it is a single sentence, with a single (albeit compound) subject. That subject is both the thing to which the lien may be applied and the thing against which the 15 per cent value requirement must be measured.

As this Court noted in *Westpointe Plaza II Limited Partnership v. Kalkreuth Roofing & Sheet Metal, Inc.,* 109 Md. App. 569, 675 A.2d 571, *cert. denied,* 343 Md. 564, 683 A.2d 177 (1996), § 9–102(a) ". . . establishes a threshold requirement for the issuance of a lien; for a lien to be established, when it is to be applied to a building which has undergone repair, repairs to the building must constitute twenty-five percent of the building's value."[1] *Westpointe Plaza II,* 109 Md.App. at 579, 675 A.2d 571. Since appellant seeks to apply a lien to the entire golf course, it was required to show that the work in question constitutes 15 per cent of the entire golf course's value.

Appellant claims a total of $237,768.30 for work that was done on Maryland National's behalf. The total value of the Maryland National Golf Course is approximately $4,000,000. As appellant correctly notes, the holding in *O–Porto Construction Co., Inc. v. Devon/Lanham, L.L.C.,* 129 Md.App. 301, 741 A.2d 576 (1999), allows appellant to aggregate the value of its

---

1. The value in question was lowered from 25 to 15 per cent by statute in 1996. 1996 Md. Laws, Chap. 435.

own work with that of Triad engineering ($29,192.30) when determining whether the total exceeds the 15 per cent threshold. *O–Porto Construction Co., Inc.*, 129 Md.App. at 308, 741 A.2d 576. However, the total of the two—$266,960.60—is still far short of the $600,000 that would represent 15 per cent of the $4 million value of the course as a whole.

Because appellant did not seek to establish and enforce a lien against the cart path alone, we need not consider whether such recourse would have been legally available. The interpretation of the statutory language that would allow such a lien is problematic at best. Appellant argues that the case of *Freeform Pools, Inc., v. Strawbridge Home for Boys, Inc., et. al.*, 228 Md. 297, 179 A.2d 683 (1962), supports the proposition that the cart path itself is a lienable structure. However, *Freeform Pools* does not support such an argument.

The Court in *Freeform Pools* was discussing whether pools fit into the category of "buildings" to which a lien may be applied, not whether their construction fit into the list of improvements that can trigger a lien[2]. The fact that "... construction or installation of any swimming pool or fencing ..." was subsequently added to the latter portion of the statutory language is taken by appellant to indicate that liens may now be applied to swimming pools, as they may be applied to pavement. In fact, if anything, it means that

---

**2.** The structure of § 9–102(a) breaks down into four parts:
—A list of things to which the law applies: "Every building erected and every building repaired, rebuilt, or improved to the extent of 15 percent of its value ...";
—The legal authority: "... is subject to establishment of a lien ... for payment of all debts ...";
—A definition of which debts are applicable: "... [those] contracted for work done for or about the building, and for materials furnished for or about the building, ...";
—And a list of examples of such work and/or materials: "... including the drilling and installation of wells to supply water, the construction or installation of any swimming pool or fencing, the sodding, seeding, or planting in or about the premises of shrubs, trees, plants, flowers, or nursery products, the grading, filling, landscaping, and paving of the premises, and the leasing of equipment, with or without an operator, for use for or about the premises."

neither swimming pools nor pavement are themselves "buildings" on which a lien may be placed, but merely types of work than can generate the right to a lien on a building with which they are associated. To read the "including" clause as modifying "building" not only does violence to the structure of the sentence, but would be difficult because the items in the list are so clearly verbs rather than nouns (drilling, installation, construction, sodding, seeding, planting, grading, filling, landscaping, paving, leasing).

Such a reading of the statutory text is supported by the existing legislative record. The General Assembly modified the text of § 9–102(a) in 1996, adding the words "and the leasing of equipment, with or without an operator, for use for or about the premises" to the end of the last sentence. According to the Floor Report, "The law provides for the establishment of liens for work done for or about a building or materials supplied for that building. . . . House Bill 255 would add the leasing of equipment, with or without a contractor [sic, should be 'operator'] . . . to the list of specified work or materials." Economic Matters Committee, Floor Report, House Bill 255, 1996 Session, Md. General Assembly. More than a dozen contractors wrote to support the bill (and one builder to oppose it), and their understanding of its meaning is unanimous—it would allow the leasing of equipment to be one of the types of work or materials that will enable the creation of a lien, not that the rental of the equipment is somehow a thing that can have a lien placed on it. Constituent letters, Legislative History file for House Bill 255, 1996 Session, Md. General Assembly. As the rental is placed at the end of a list of other items such as paving, it must be the case that all of those items are work or materials whose provision can create a lien, not variations of the definition of "building" on which a lien may be placed.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**