*In the Matter of Ronald Meddings*, No. 2096, September Term 2018. Opinion by Wells, J.

**ESTATES AND TRUSTS – GUARDIANSHIP – GUARDIANSHIP OF THE PERSON – LESS RESTRICTIVE FORMS OF INTERVENTION**

Ronald Meddings requested a bench trial after the Maryland Department of Health and Mental Hygiene ("DHMH") petitioned the circuit court for the appointment of a guardian of his person. DHMH sought an order finding that Mr. Meddings was disabled and that there was no less restrictive form of intervention other than a guardianship consistent with his welfare and safety under Maryland Estates and Trusts Article § 13-705. Given Mr. Meddings' unrebutted diagnosis of schizophrenia, extremely violent behavior, and unwillingness to take prescription medication to treat his psychosis, the court's appointment of a guardian was the least restrictive form of intervention that provided for Mr. Meddings' welfare and safety.

**ESTATES AND TRUSTS – GUARDIANSHIP – GUARDIANSHIP OF THE PERSON – LESS RESTRICTIVE FORMS OF INTERVENTION -- STANDARD OF REVIEW**

Ronald Meddings argues that the circuit court erred when it found that there was no less restrictive form of intervention that was consistent with his welfare and safety under Maryland Estates and Trusts Article § 13-705 other than the appointment of a guardian of his person. In a bench trial such as this, we review the trial judge's factual findings for clear error.

Circuit Court for Howard County
Case No. C-13-FM-18-50

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2096

September Term, 2018

_____

IN THE MATTER OF RONALD MEDDINGS

_____

Friedman,
Beachley,
Wells,

JJ.

_____

Opinion by Wells, J.

_____

Filed: December 23, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Circuit Court for Howard County granted Appellee, the Clifton T. Perkins Hospital Center's ("Perkins") petition for a guardianship of the person for Appellant, Ronald Meddings, a criminal defendant diagnosed with schizophrenia and atrial fibrillation.[1] Meddings has resided at Perkins since 2017 after he was found incompetent to stand trial for assault. After a bench trial on Perkins' petition, the court found that Meddings was disabled and appointed Meddings' brother, Fred Osborne, as his guardian.

Meddings filed a timely appeal and asks the following question: "Did the Trial Court err in finding that no less restrictive form of intervention is available?"

For the reasons discussed below, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Ronald Meddings, age 68, has had a long history of mental and physical health problems. At some point during his life, Meddings was diagnosed with schizophrenia. According to the testimony of his brother, Fred Osborne, Meddings has received at-home, self-living, outpatient, and in-patient medical care since the 1970's. In 2008, the circuit court appointed a guardian to make decisions regarding Meddings' finances and property. *In the Matter of Ronald L. Meddings,* Circuit Court for Cecil County, Maryland, 07-D-08-523.

---

[1] Atrial fibrillation is defined as "an abnormal heart rhythm characterized by rapid and irregular beating of the atria." *Heart Disease Other Related Conditions,* https://bit.ly/2q772d3, September 3, 2014.

In 2017, while Meddings was being treated at a Veterans Administration Hospital in Baltimore, he allegedly approached a nurse, grabbed her by the neck, and attempted to choke her. As the nurse tried to defend herself, she and Meddings fell to the floor. Security personnel had to forcibly remove Meddings from the nurse, but he continued to try to kick her. As a result of this incident, the State charged Meddings with first and second-degree assault. During that prosecution, the Department of Health and Mental Hygiene confirmed that Meddings suffered from schizophrenia. The circuit court found Meddings incompetent to stand trial and committed him to Perkins on August 7, 2017.

## A. Issues that Led Perkins to File for Guardianship

A number of issues arose after Meddings was committed. *First*, Meddings refused to take psychotropic medication or drugs prescribed to treat his atrial fibrillation. As a result, Perkins resorted to the use of a Clinical Review Panel ("CRP"). A CRP is a group of Perkins doctors and other medical professionals who convene at 90-day intervals to review and approve Meddings' anti-psychotic medicine. Once the panel approves the medication, and if Meddings refuses to take it, Perkins staff may forcibly administer it to him. From the time Meddings arrived at Perkins in August 2017 until April 2018, when Perkins filed for guardianship, a CRP had to be convened three times. On each occasion, the CRP determined that Meddings' psychotropic medications, Squetiapine, Oxcarbazepine, and Benztropine, were appropriate. Meddings was involuntarily

medicated based on the panel's approval. Even after taking these drugs, Meddings remained actively psychotic.

*Second*, according to the testimony of Meddings' doctors, treatment of Meddings' atrial fibrillation is not subject to the CRP. Meddings was prescribed the drug Metoprolol to treat his heart problem, but he refused to take it. With his atrial fibrillation untreated, according to his doctors, Meddings risks having a heart attack or stroke. Meddings' doctors fear if he had either a stroke or heart attack, he will need additional medical treatment, in which case the CRP would be ineffective as the CRP may be used only to treat Meddings' mental health issues.

*Third*, Meddings did not have an advance medical directive. This fact complicated the range of options available to Perkins should Meddings need somatic medical treatment, since Meddings never made known his intentions for extraordinary medical intervention should he be physically incapacitated and in need of such care. As there was no way to force Meddings to treat his coronary problems via the CRP, the risk that he would need some sort of somatic intervention increased.

To address these on-going concerns, on April 20, 2018, Perkins filed a petition in the Circuit Court for Howard County seeking the appointment of a guardian for Meddings' person. As Meddings did not have the funds to hire his own attorney, the court appointed counsel for him. On May 31, 2018, the court named the Howard County Office of Aging as Meddings' temporary guardian, specifically to approve administration of somatic

medication. After contacting Fred Osborne, Meddings' brother, Perkins amended the guardianship petition and added Osborne an interested party to the proceedings.

**B. Summary of Trial Testimony**

On August 5, 2018, the court, sitting without a jury, heard testimony on Perkins' petition for guardianship. At trial, Meddings' psychiatrist at Perkins, Dr. Htwe, testified that Meddings' prior diagnoses of schizophrenia and atrial fibrillation were accurate. According to Dr. Htwe, Meddings suffers from "psychosis, paranoia, hearing voices," and delusions. As a result, Meddings is often irritable and can frequently be heard yelling and screaming.

According to Dr. Htwe, Meddings has had several violent outbursts that placed him or others at risk of physical harm while at Perkins. For example, Dr. Htwe recounted that on one occasion Meddings attempted to jump over the nurse's station and tried to attack a nurse. On a different occasion, Meddings threw his glasses over the nurse's station. At times, Meddings has thrown shoes at Dr. Htwe. On another occasion, Meddings assaulted a Perkins security guard. During yet another episode, Meddings was so violent that he required five restraints to contain him.

Regarding Meddings' heart problems, Dr. Htwe testified that because of his atrial fibrillation, a clot could form on Meddings' heart. If this were to happen, Dr. Htwe feared that Meddings might suffer "a stroke, heart attack, and lead[] to. . . losing[] the limbs for instance causing gangrene." Additionally, the doctors are unsure whether Meddings may

-4-

also suffer from a "seizure disorder, chronic COPD, [and/or] chronic obstructive lung disease." According to Dr. Htwe, Meddings needs to see a heart specialist to treat his atrial fibrillation and any other cardiovascular issues. Meddings was prescribed the drug Metoprolol for atrial fibrillation. Dr. Htwe noted that, "95 percent of the time, he's not taking it. Lately he is not taking it." Specifically, Dr. Htwe noted that Meddings did not take the Metoprolol in July or August of 2018.

Dr. Htwe testified that Meddings does not understand the diagnosis for schizophrenia nor for atrial fibrillation. In Dr. Htwe's view, Meddings has no ability to "understand, make, and communicate decisions with respect to his health care." Meddings refuses to voluntarily take medication, which Dr. Htwe believes to be a result of the schizophrenia. Further, Dr. Htwe noted that Meddings has no healthcare advance directive on file because "he is unable to do it and understand the concept of it. So [Perkins] couldn't do it" and Meddings does not have the ability to complete one at present. In fact, Perkins never attempted to ask Meddings to sign one because "it's very, very difficult to engage him. Let alone the advance directive involves quite a bit of understanding."

Dr. Htwe opined that the CRP is not an effective long-term treatment plan for Meddings. In addition to the CRP not being able to approve somatic medications, Dr. Htwe noted that the CRP is by necessity an adversarial process where he, as Meddings' doctor, is pitted against him. According to Dr. Htwe, the CRP "has already affected the . . . relationship between me and him." Further, according to Dr. Htwe, the CRP is time-limited

-5-

in that the period for which involuntary medication is approved is only ninety (90) days. In Dr. Htwe's opinion, the CRP is an unstable procedure because a medication approval could lapse without vigilant monitoring, leaving Meddings without a necessary drug. Dr. Htwe alluded to an instance in January 2018 when Meddings' psychotropic medicines ran out, the CRP could not be convened quickly, and Meddings "was really out of control." "So we learned the hard way this January." Overall, Dr. Htwe felt that the CRP was unreliable and bad for the doctor-patient relationship.

A second psychiatrist at Perkins, Dr. Samer Patel, who sees Meddings several times per year, testified that he has tried to communicate with Meddings about the schizophrenia diagnosis. According to Dr. Patel, Meddings' disorganized thinking leads Meddings to believe that he is not schizophrenic. In fact, Dr. Patel said Meddings, "believes he is being held [at Perkins] against his will and that we are poisoning him with medications." When asked if Meddings was ever part of a conversation about taking medications after discharge from Perkins, Dr. Patel responded: "When I spoke with [Meddings in mid-June 2018,] he said he did not feel he needed to take medications, that it was poison, and that we were holding him hostage and feeding him poison." Dr. Patel also tried to discuss Meddings' somatic problems with him, which was similarly unsuccessful.

Like Dr. Htwe, Dr. Patel's testimony described episodes of Meddings' aggressive behavior, including an incident that occurred in May 2018, when Meddings "ran to the bathroom and tried to unscrew a pipe from the sink. When staff inquired what he was going

to do he said he was going to unscrew it to assault staff with it." Staff brought in security personnel who restrained him.

Dr. Patel opined that Meddings lacks the capacity to make his own health care decisions and testified that he thought a guardianship would be the best alternative. "I think he would need guardianship to be able to maintain his safety at this time." Dr. Patel specifically stated that the CRP has undermined Meddings' relationship with Dr. Htwe, his primary psychiatrist, because Dr. Htwe has had to testify against Meddings at the CRP hearings, "upsetting" Meddings. Dr. Patel also noted that the CRP cannot address Meddings' somatic needs.

Fred Osborne, Meddings' brother who put himself forward to be Meddings' guardian, also testified. Osborne stated that his brother "needs medical attention whether he wants it or not. He needs to be medicated, he needs to be under care." After recounting Meddings' physical and mental decline over more than a dozen years, Osborne told the court:

> I am here for purposes of meds more than anything else. I know that right now he's not capable of performing or doing and living on his own, or even in a controlled out-patient kind of scenario. It's not there. I just want the Court to understand that I am here for him. That's it.

At the end of the testimony and counsels' arguments the court recessed. The judge later returned and said the following:

> Thank you very much. Well, I accept the expert testimony that the defendant has schizophrenia, thought disorder, psychosis, paranoia, not fully oriented in time, month, year. Doesn't understand his diagnosis, won't take his meds.

He is aggressive, throwing things, assaulting officers, yelling and screaming, trying to choke a nurse at the nurse's station, fighting with his peers. And he also has the somatic issue of atrial fibrillation which could be a very serious impediment to his health in terms of blood clots and strokes and heart attacks.

I do find by clear and convincing evidence that the respondent lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his health care. And that because of his mental disability, schizophrenia, no less-restrictive form of intervention is available that is consistent with his welfare and safety.

And I would appoint, hearing no objection, I would appoint Mr. Fred Osbourne to serve as the guardian of his person.

And, Counsel, would you submit an order consistent with that?[2]

Meddings, through counsel, subsequently filed this appeal.

STANDARD OF REVIEW

The parties do not agree on the appropriate standard of appellate review. Meddings urges us to employ the least deferential standard, namely, de novo review. He argues that the circuit court committed legal error in interpreting Maryland Code Annotated (1974, 2017 Repl. Vol.), Estates and Trusts Article ("E&T") §13-705(b)(2),[3] when it determined

---

[2] While we reproduce the court's ruling here in full and conclude, as will be discussed, that it is an adequate basis on which to affirm, we gently and respectfully note that the better practice would be for the court to fully articulate the factors on which the court bases its decision. Doing so will avoid confusion and establish a clear record should a reviewing court be required to search for potential error.

[3] (b) A guardian of the person shall be appointed if the court determines from clear and convincing evidence that:

that there "was no less restrictive form of intervention available in Meddings' case." Meddings specifically states in a footnote that clear error should not be the standard. "[T]he Trial Court made a legal conclusion based on findings of fact; thus, the clearly erroneous standard does not apply."

In support of his position, Meddings relies on our holding in *Simbaina v. Bunay*, 221 Md. App. 440 (2015), a custody case concerning a "special immigrant juvenile" (SIJ). The Circuit Court for Baltimore City denied mother's request to amend a judgment of absolute divorce to include factual findings that the child at the center of the parties' custody dispute was an SIJ. *Id*. at 447. In taking up the appeal, we acknowledged that, generally, we review the circuit court's denial of a motion to alter or amend judgment using the abuse of discretion standard. *Id*. at 448. But we concluded that when the circuit court, sitting as a court of equity, has issued an order that involves an interpretation and application of Maryland constitutional, statutory, or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a de novo standard of

---

(1) A person lacks sufficient understanding or capacity to make or communicate responsible personal decisions, including provisions for health care, food, clothing, or shelter, because of any mental disability, disease, habitual drunkenness, or addiction to drugs; and

(2) No less restrictive form of intervention is available that is consistent with the person's welfare and safety

E&T § 13-705(b) (1974, 2017 Repl. Vol.).

review." *Simbaina*, 221 Md. App. at 448 (quoting *Schisler v. State*, 394 Md. 519, 535 (2006)).

Meddings also favorably cites *Himelstein v. Arrow Cab*, 113 Md. App. 530 (1997), *aff'd., Arrow Cab v. Himelstein*, 348 Md. 558 (1998), in which this Court was asked to consider whether a security interest held by the Maryland Motor Vehicle Administration was an asset that could be used to satisfy a claim against Arrow Cab for injuries a passenger, Himelstein, sustained in an accident involving a cab. *Id*. at 533. The issue was whether Arrow Cab, as a separate entity, could use the security interest to satisfy the judgment, or whether the security interest was an asset of individual cab owners who were members of the unincorporated association trading as "Arrow Cab." *Id*. at 531-32. The Circuit Court for Baltimore City found that the interest was held by the individual cab owners and could not be used to satisfy Himelstein's judgment. *Id*. at 534-35.

Before considering the merits of Himelstein's appeal, we first had to determine the appropriate standard of review. As the matter was tried without a jury, we determined that Rule 8-131(c) mandated that we apply clear error to the circuit court's factual determinations. *Himelstein*, 113 Md. App. at 536. But, because the central issue was the circuit court's interpretation of the Maryland Self-Insurance regulation (COMAR 20.90.02.19 (as in effect in 1997)), we concluded that the de novo standard was appropriate. *Id*. "Because the trial judge's interpretation of the statute is a question of law, our standard of appellate review is whether the lower court was 'legally correct.'" *Id*. (citation omitted).

-10-

Perkins, on the other hand, urges us to employ the "clearly erroneous" standard. In Perkins' estimation, the circuit court did not engage in interpretation of E&T § 13-705(b), but, rather, only applied the facts presented at trial to the statute. Perkins finds support for its position in *L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.*, 165 Md. App. 339 (2005) and *Webb v. Nowak*, 433 Md. 666 (2013).

L.W. Wolfe was a contractor who performed work for Maryland National Golf but was not paid. 165 Md. App at 342. After a show cause hearing, Wolfe was granted an order establishing an interlocutory lien against Maryland National Golf. *Id*. Later, after trial, Wolfe was denied a mechanic's lien against Maryland National Golf, and the court terminated the interlocutory order. *Id.* Wolfe then appealed.

We determined the "clearly erroneous" standard was appropriate because the trial court exclusively made factual determinations and applied the law, rather than interpreting it.

> [A]t the hearing, Judge Adams referred exclusively to the contents of exhibits and testimony when discussing her finding that the work was repair, in contrast to her discussion of whether paving work was lienable, in which she did discuss precedent. The lower court therefore applied the law in this matter—it did not interpret it. As such, the "clearly erroneous" standard is indeed the correct one and we will use it here.

*Id*. at 345. It should be noted that a second issue, review of the circuit court's determination of the value of repairs, required a legal determination. Consequently, we engaged in an independent appraisal of whether the circuit court's decision was legally correct. *Id*.

In *Webb*, the Webbs sued their neighbors, the Nowaks, alleging that the Nowaks removed timber from Webbs' property. 433 Md. at 669. The Webbs sought compensatory and punitive damages, as well as damages under a common law theory of trespass. *Id.* The Nowaks filed a counterclaim seeking a declaratory judgment that they, in fact, owned the disputed property. *Id.* After a bench trial, the Circuit Court for Washington County entered a judgment in favor of Nowaks. *Id.* The Webbs appealed.

Before addressing the merits, the Court of Appeals considered whether we were correct in applying the clear error standard of review. *Id.* at 675. Before the Court of Appeals, the Webbs argued that because the appeal concerned the interpretation of a deed, a reviewing court should apply a de novo standard. *Id.* at 676. The Nowaks argued that a boundary dispute, not the interpretation of a deed, was the issue on appeal. Therefore, in the Nowaks' view, we applied the proper standard, clear error. *Id.* The Court of Appeals agreed with the Nowaks, holding:

> We agree with Respondents' [the Nowaks'] contention that the "clearly erroneous" standard is the correct standard of appellate review for this case. In *Union United Methodist Church, Inc. v. Burton*, 404 Md. 542, 556 (2008), we held that "the ultimate determination by the circuit court of the proper location of [a] disputed boundary is a question of fact, which we shall review for clear error." Further, according to *Millar v. Bowie*, 115 Md. App. 682, 688 (1997) "[i]t is clear that a decision of a trial judge, sitting without a jury, that resolves a boundary line dispute, is not to be disturbed unless clearly erroneous."

*Webb*, 433 Md. at 676.

In Meddings' case, the circuit court conducted a bench trial to determine whether a guardianship was appropriate. Accordingly, we look to Rule 8-131(c), which states in its entirety:

> (c) Action Tried Without a Jury.—When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Md. Rule 8-131(c). Writing for this Court in *Starke v. Starke*, 134 Md. App. 663, 669 (2000), Judge Moylan made clear that "Rule 8–131(c) applies only to verdicts, conferring on an appellate court the authority to review a verdict on the evidence." Indeed, "no such review of the sufficiency of the evidence was traditionally available in a court trial, however, because a judge, in his capacity as a legal referee, was not required to make a legal ruling before submitting the case to himself, in his capacity as a fact finder." *Id*. As has been noted, the Rule informs us that the circuit court's factual determinations that form the court's verdict are subject to clear error review. *Himelstein*, 113 Md. App. at 536. "This Court 'will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.'" *L. W. Wolfe*, 165 Md. App. at 343 (citations omitted). "If there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *Id*.

-13-

Our research has found scant discussion of the appropriate standard of review in adult guardianship cases. However, in one case, *Mack v. Mack*, 329 Md. 188, 191 (1993), the Court of Appeals affirmed in part and reversed in part a circuit court's decision regarding the guardianship of Ronald Mack, an adult who was hospitalized in "a persistent vegetative state." Specifically, the Court of Appeals reviewed the circuit court's decision to appoint a temporary guardian before the court sorted out dueling petitions for guardianship between Mack's father and Mack's wife. *Id*. 194-95. The circuit court also ordered that life support could not be withdrawn, as Mack's wife desired, because, in the circuit court's estimation, the evidence was unclear as to Mack's intentions regarding such measures when he was conscious. *Id*. at 195-96.

The majority, noting that the trial judge found the evidence conflicting, simply stated that the circuit court's factual findings were "not clearly erroneous." *Id*. at 217. In a concurring and dissenting opinion, Judge Chasanow, citing Rule 8-131(c) wrote: "The majority fails to take into consideration [the] basic legal principle [that] when a trial judge sits without a jury, an appellate court will not set aside the trial court's judgment on the evidence unless it was clearly erroneous." *Id*. at 230.

We also observe that we review a circuit court's factual findings for child custody orders for clear error. In *In Re Adoption/Guardianship No. 3598*, 347 Md. 295, 311-12 (1997), the Court of Appeals applied the "clearly erroneous" standard when evaluating the circuit court's factual findings for a decree of adoption granted through a private adoption

-14-

agreement, and questions were raised as to whether the adoption was in accord with the Interstate Compact on the Placement of Children (ICPC). The Court of Appeals held similarly in *In re Adoption of Cadence B.*, 417 Md. 146 (2010), where the circuit court determined that reunification was impossible in a Child In Need Of Assistance (CINA) case, and proceeded to open adoption. In this instance, the Court of Appeals reviewed the circuit court's findings of fact using the clear error standard. *Id.* at 155-56.

We note that in *Mack*, when the Court of Appeals addressed whether the wife's Florida-issued appointment as her husband's guardian was valid in Maryland under the Full Faith and Credit clause of the U.S. Constitution, the Court noted that, "although Maryland appellate courts have not spoken on jurisdiction in the guardianship context, cases dealing with jurisdiction in child custody matters are analogous." 329 Md. at 199.

From this review of case law, we confirm an established principle of appellate review: a trial court's factual findings will be reviewed for clear error. *See In re Adoption of Cadence B.*, 417 Md. at 155-56; *In Re Adoption/Guardianship No. 3598*, 347 Md. at 311-12; *Wolfe*, 165 Md. App. at 343; *Himelstein*, 113 Md. App. at 536. But a trial court's legal rulings are accorded no deference and we exercise our independent review to determine whether the trial court was legally correct. *See Simbaina*, 221 Md. App. at 448; *Wolfe*, 165 Md. App. at 345. The appropriate standard of review is determined by whether the circuit court, in reaching its decision, applied the facts adduced at trial to a statute, or

whether the decision was based on the interpretation of a statute. *See Webb*, 433 Md. at 676.

Further, we observe that guardianship proceedings, whether they involve minors or adults, are equitable proceedings. The appointment of a guardian is a matter within the court's discretion.

> [A] court of equity assumes jurisdiction in guardianship matters to protect those who, because of illness or other disability, are unable to care for themselves. In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility . . . . [A]ll the parties here should be reminded that appointment to that position rests solely in the discretion of the equity court and the administering of that office as it pertains to both the person and property of the ward is subject to judicial control.

*Kicherer v Kicherer*, 285 Md. 114, 118-19 (1979).

We favor the analogy between adult and juvenile guardianship cases. We conclude that in reviewing whether a circuit court properly decided to appoint a guardian for an adult, we adopt a tri-partite and interrelated standard of review. Factual findings will be reviewed for clear error, while purely legal determinations will be reviewed without deference, unless the error be harmless. As to the ultimate conclusion of whether an adult guardianship is appropriate, the circuit court's decision will not be disturbed unless there has been a clear abuse of discretion. *See In re Adoption of Cadence B.*, 417 Md. at 155-56; *In Re Adoption/Guardianship No. 3598*, 347 Md. at 311-12.

-16-

DISCUSSION

I.      The Parties' Contentions

        A. Meddings

Meddings argues that the trial court should have found there were less restrictive alternatives to a guardianship. In his brief and at oral argument, Meddings asserted that Perkins has three alternatives at its disposal that are less restrictive than a guardianship: (1) the CRP, (2) a surrogate decision maker, and (3) an advance directive.

According to Meddings, pursuant to E&T § 13-705(b), at trial, Perkins had to prove by clear and convincing evidence that Meddings "lack[ed] sufficient understanding or capacity to make or communicate responsible decisions concerning his person," and that "no less restricted intervention" to guardianship existed. Citing *Spengler v. Sears, Robebuck & Co.*, 163 Md. App. 220, *cert. denied*, 389 Md. 126 (2005), Meddings notes that we defined "clear and convincing" as meaning "'highly probable,' not 'merely probable.'" *Id*. at 247 (citation omitted). Meddings argues that a guardianship is the most restrictive alternative in that it deprives him of "the right to make nearly all decisions." In short, Meddings argues that Perkins did not prove by clear and convincing evidence that a guardianship was the least restrictive alternative.

        1. The CRP

In Meddings' view, one less restrictive alternative that the trial court rejected is the CRP. Maryland Code Annotated (1991, 2018 Repl. Vol.), Health-General Article ("HG")

§ 10-708 provides the statutory authority for the CRP.[4]  Meddings claims that it would be a less restrictive alternative to a guardianship and preferable because the CRP would provide him with due process protections against arbitrary forced medication.  Meddings notes that Perkins may seek a CRP if Meddings refuses medication for 72 hours or more.[5]  The CRP must convene within nine days.[6]  The treatment plan would be valid for a ninety day period but may be renewed.[7]

According to Meddings, most importantly, the CRP affords him notice, the opportunity to be present, request witnesses, have a lay advisor, and gives him the opportunity to appeal the administrative law judge's decision to the circuit court.[8]  Meddings notes in his brief that the CRP "allows for both continuity of care and protection of due process rights."

Meddings asserts that despite Perkins' protests that the CRP harms the patient-physician relationship, "guardianship can also be contentious and harm the doctor-patient

---

[4] Specifically, HG § 10-708(b) provides:
(b) Medication may not be administered to an individual who refuses the medication, except:
(1) In an emergency, on the order of a physician where the individual presents a danger to the life or safety of the individual or others; or
(2) In a nonemergency, when the individual is hospitalized involuntarily or committed for treatment by order of a court and the medication is approved by a panel under the provisions of this section.

[5] MD. CODE ANN., HEALTH-GEN. § 10-708(j).
[6] MD. CODE ANN., HEALTH-GEN. § 10-708(n)(1).
[7] MD. CODE ANN., HEALTH-GEN. § 10-708 (n)(2)(i).
[8] MD. CODE ANN., HEALTH-GEN. § 10-708(d), (e), and (l).

relationship," because if a patient refuses treatment a doctor may seek consent "from other sources." Further, according to Meddings, even with guardianship, a patient may still be non-compliant with taking prescribed medication. Further, according to Meddings, the guardian might not be able to force compliance, as would be the case with a CRP.

### 2. Surrogate Decision-Makers

Meddings asserts that another less restrictive form of intervention would be a surrogate decision-maker. Dr. Htwe testified that Meddings refuses to take his heart medication. According to Meddings, while a guardian can approve a heart medication, the guardian cannot force the ward to take the medication. The thrust of Meddings' argument is that if Perkins needs someone to approve Meddings' heart medication, then a surrogate decision-maker could perform that task, and a surrogate decision-maker would be a less restrictive form of intervention than a guardianship.

### 3. Advance Directive

The other form of intervention Meddings claims as a less restrictive alternative to guardianship is an advance healthcare directive. Meddings argues that Perkins did not present him with an opportunity to sign an advance directive. He notes that Dr. Patel testified in his physician's certificate supporting the petition for guardianship that Meddings was mentally unable to complete an advance directive, because of his schizophrenia. Meddings argues that Dr. Patel, however, has not "presented [Meddings] with any legal matters." Meddings asserts that Perkins and the circuit court should have

given him the opportunity to try to sign an advance directive before either concluded that he could not understand the concept and benefits of an advance directive.

### B. Perkins

Perkins argues that the trial court properly found by clear and convincing evidence that there was not a less restrictive intervention available for Meddings' safety and welfare, except guardianship. Answering Meddings' arguments, Perkins asserts that the issue isn't whether a less restrictive form of intervention exists, rather, the issue is "whether a less restrictive alternative was available and consistent with Mr. Meddings' own welfare and safety needs." Perkins insists that by removing the consideration for what is "available which is consistent with his welfare and safety," Meddings attempts to unreasonably narrow the court's inquiry to simply "a binary question" of whether alternatives to guardianship existed.

In support of its position, Perkins asks us to consider *Department of Health and Mental Hygiene v. Dillman*, 116 Md. App. 27 (1997), in which we held that the word "available," means "practically and actually available." *Id*. at 36. William Dillman was confined to the Rosewood Center, a Department of Health and Mental Hygiene-run (DHMH) facility for individuals with developmental disabilities. *Id*. at 30. Dillman had committed two different criminal offenses, which the State later dismissed, but Dillman remained at Rosewood. *Id*. The question arose whether Dillman met the criteria for continued confinement at Rosewood consistent with the notice and admission requirements

found in the version of the code then in effect, HG § 7-503(a).[9]  *Id.*   An administrative law judge (ALJ) found that Dillman needed supervision.  *Id.*   DHMH thought that Dillman would be a good candidate for a community-based facility, but it did not have the funds to pay for such a placement.  *Id*. at 31.  As a result, the ALJ required Dillman to stay at Rosewood.  *Id.*  at 32.

Dillman sought judicial review.  He argued that he could reside in a less restrictive, community-based facility, but DHMH refused to place him in the less restrictive residence because it did not have the money to pay for it.  *Id*. at 32-33.

We held that DHMH could consider whether funding was available when determining the least restrictive facility in which to place an involuntarily committed individual even though his behavior might suggest he was able to live in a less restrictive environment.  *Id*. at 39-40.  In reaching that decision, we said that,

> the legislature intended the term "available" within the meaning of H.G. § 7–503(e)(1)(iii) and Title 7 to require a showing by clear and convincing evidence that an individual's needs cannot be met in a less restrictive setting that is practically and actually available. This interpretation necessarily permits the ALJ to take financial considerations into account.

*Id*. at 40 (emphasis supplied).  Perkins asks us to apply this same reasoning to E&T § 13-705(b) and hold that the sentence "no less restrictive form of intervention is available that

---

[9] Maryland Code Annotated (1986, 1991 Repl. Vol.), Health-General Article § 7-503. This section was held unconstitutional in *Reese v. Department of Health and Mental Hygiene*, 177 Md. App. 102 (2007), where we held that a mentally challenged petitioner was denied due process when she was not afforded a contested hearing when application to a State residential center was denied.

is consistent with the person's welfare and safety" means, no less restrictive form of intervention *is practically and actually available* that is consistent with the person's welfare and safety.

For the same reasons that Doctors Htwe and Patel articulated in their trial testimony, Perkins argues in its brief that the CRP, a surrogate decision-maker, and use of an advance directive are not "practically available" alternatives in Meddings' case because they are inconsistent with his health and welfare. The CRP, according to Perkins, is an adversarial proceeding detrimental to the patient-physician relationship. Further, in Perkins' estimation, it is cumbersome and "unreliable," in that renewal of a CRP is for three-month intervals and should a patient such as Meddings run out of his psychotropic medicine, a new panel cannot be readily re-convened. According to Perkins' doctors, Meddings does not believe he suffers from a mental illness and has such disorganized thinking that he cannot understand the concept of an advance directive. Therefore, trying to get him to adopt one would be a futile exercise. Finally, regarding a surrogate decision-maker, consistent with HG § 5-605(d)(2), Perkins argues that a surrogate "may not authorize treatment for a mental disorder." Having heard and considered these alternatives at trial, Perkins argues that the circuit court properly found by clear and convincing evidence that a guardian was the least restrictive alternative for Meddings.

II. ANALYSIS

We begin our analysis with E&T § 13-705(a) which states that "[o]n petition and after any notice or hearing prescribed by law or the Maryland Rules, a court may appoint a guardian of the person of a disabled person."[10] "Disabled person" is defined in E&T § 13-705(a) as an individual who "has been judged by a court to be unable to provide for the person's daily needs sufficiently to protect the person's health or safety for reasons listed in E&T § 13-705(b) of this title and … as a result of this inability requires a guardian of the person."[11]

A circuit court "may grant to a guardian of a person only those powers necessary to provide for the demonstrated need of the disabled person."[12] The court has discretion in the setting the decision-making powers of the guardian as well as the length of the guardianship.[13] In addition, the trial court can tailor the guardianship order to meet the needs of the ward.[14] The circuit court may appoint a guardian that has "the same rights, powers, and duties that a parent has with respect to an unemancipated minor child;" "the right to custody of the disabled person to establish the disabled person's place of abode

_____

[10] MD. CODE ANN., EST. & TRUSTS § 13-705 (1974, 2019 Repl. Vol.)
[11] MD. CODE ANN., EST. & TRUSTS § 13-101(f)(ii) (1974, 2019 Repl. Vol.).
[12] MD. CODE ANN., EST. & TRUSTS § 13-708(a)(1) (1974, 2019 Repl. Vol).
[13] MD. CODE ANN., EST. & TRUSTS § 13-708(a)(2).
[14] MD. CODE ANN., EST. & TRUSTS § 13-708(b)

-23-

within and without the State;" or "the power to give necessary consent or approval for: medical or other professional care, counsel, treatment, or service."[15]

In Meddings' case, the record shows that Perkins filed a petition for guardianship of Meddings' person, he was served with notice, the court appointed counsel for him, and he presented evidence at trial as to why a guardianship was not necessary. Neither side disputes that the requirements of E&T § 13-708(a) were satisfied. Further, we note that pursuant to E&T § 13-708(b), the court limited the guardian's decision making powers to "consent to necessary protective services and to consent to the disabled person's placement in a nursing home or other appropriate living arrangement" and "consent to medical or other professional care, counsel, treatment, or service for the disabled person, including, but not limited to, psychiatric care, medication, and treatment for Ronald Meddings, including treatment expressly refused by Ronald Meddings." The trial court did not limit the duration of the guardianship pursuant to E&T § 13-708(a).

As previously noted, E&T § 13-708(b) is at the heart of the dispute. Interestingly, neither party challenges the contention raised in the guardianship petition that Meddings "lacks sufficient understanding or capacity to make or communicate responsible personal decisions, including provisions for health care, food, clothing, or shelter, because of any mental disability." Nevertheless, Meddings argues that there are "less restrictive form[s] of intervention … available that [are] consistent with [his] welfare or safety." Among

---

[15] MD. CODE ANN., EST. & TRUSTS § 13-708(b)(1)-(2), (9)(i).

-24-

them, according to Meddings is the CRP, use of an advance healthcare directive, and a surrogate healthcare decision maker.

A. Rejection of the Use of an Advance Directive Was Not Clear Error

As we see it, Meddings' argument concerning the use of an advance directive is without merit. Reviewing the statutory authority for the use of advance directives, we observe that "[a]ny competent individual may, at any time, make a written or electronic advance directive regarding the provision of health care to that individual."[16] "In the absence of a validly executed or witnessed advance directive, any authentic expression made by an individual while competent of the individual's wishes regarding health care for the individual shall be considered."[17] Further, we note that HG § 5-602(b)(2) provides that "any competent individual may, at any time … appoint[] an agent to make health care decisions for the individual under the circumstances stated in the advance directive."[18]

To be valid, written advance directives must be dated, signed, and must be witnessed by two different people, while electronic advance directives are effective upon an authentication of the signer.[19] An advance directive can be made orally.[20] An advance directive becomes operable when two physicians certify in writing that the patient is

---

[16] MD. CODE ANN., HEALTH-GEN. § 5-602(a)(1) (2008, 2019 Repl. Vol.).
[17] MD. CODE ANN., HEALTH-GEN. § 5-602(a)(2).
[18] MD. CODE ANN., HEALTH-GEN. § 5-602(b)(2).
[19] MD. CODE ANN, HEALTH-GEN. § 5-602(c)(1), (3).
[20] MD. CODE ANN., HEALTH-GEN. § 5-602(d).

incompetent.[21] Finally, we note that "[a]ny person authorized to make health care decisions under this section shall base those decisions on the wishes of the patient."[22]

The most significant element of a valid advance directive is that the maker be competent to create it. The undisputed evidence adduced at trial is that Meddings is mentally incompetent because he suffers from schizophrenia. Dr. Htwe, Meddings' psychiatrist at Perkins, described Meddings as "floridly schizophrenic" and cannot understand the concept of an advance directive. In his current state, Meddings has repeatedly refused medication to treat his mental illness. Arguably, if Meddings had executed an advance directive when competent, and later refused anti-psychotic and somatic medications, Meddings' agent could refuse both treatments as doing so would be consistent with Meddings' stated wishes. For these reasons, we cannot find that the circuit court's decision to reject the use of an advance directive was clear error.

B. Rejection of the Use of a Surrogate Decision Maker Was Not Clear Error

For similar reasons, we cannot determine that the circuit court's rejection of the use of a surrogate decision-maker was clear error either. Preliminarily, we note that a qualified surrogate "may make decisions about health care for a person who has been certified to be incapable of making an informed decision and who has not appointed a health care agent

---

[21] MD. CODE ANN., HEALTH-GEN. § 5-602(e).
[22] MD. CODE ANN., HEALTH-GEN. § 5-605(c)(1).

-26-

in accordance with this subtitle or whose health care agent is unavailable."[23]  "Any person authorized to make health care decisions for another under this section shall base those decisions on the wishes of the patient."[24]  In our view, the use of a surrogate decision-maker, of necessity, presupposes that the person designating the surrogate be competent to do so.  It is an uncontested fact that Meddings is mentally incompetent.  Of additional significance in this case, is that "[a] surrogate may not authorize: . . . treatment for a mental disorder."[25]  One of the chief reasons Perkins desired the appointment of a guardian was to authorize treatment for Meddings' somatic and mental health issues.  A surrogate could not accomplish the latter task.  We do not perceive clear error in the court's rejection of the use of a surrogate decision-maker in Meddings' case.

C. Rejection of the CRP Was Not Clear Error

Finally, we consider Meddings' argument regarding the CRP.  Meddings' chief argument in favor of the CRP is that it affords him due process or an opportunity to contest forced medication.  Prior to 1991, a previous version of HG § 10-708 authorized a form of the CRP that did not consider or address the due process rights of an individual confined to a state-run facility who refused medical treatment of a mental disorder.  (*See* HG § 10-

---

[23]MD. CODE ANN., HEALTH-GEN. § 5-605(a)(2) (1993, 2019 Repl. Vol.). "Unavailable" in this sense means the doctor cannot determine if there is, who is, where the healthcare agent is, or that the health care agent or surrogate decision maker does not respond timely to a doctor's requests for information about the patient's wishes. MD. CODE ANN., HEALTH-GEN. § 5-605(a)(1)(iii).

[24] MD. CODE ANN., HEALTH-GEN. § 5-605(c)(1).

[25] MD. CODE ANN., HEALTH-GEN. § 5-605(d)(2).

708, Chapter 480, Laws of Maryland 1984). Pursuant to the previous version of the statute, a CRP could convene and authorize the forced medication of a person without notice. *Williams v. Wilzack*, 319 Md. 485 (1990) raised a constitutional challenge to the statute. The Court of Appeals, seeking guidance in federal precedent, specifically, in *Washington v. Harper*, 494 U.S. 210 (1990), held that the original version of HG § 10–708 "did not afford the requisite procedural due process protections to which [an individual] was entitled." *Williams*, 319 Md. at 509–10.

In 1991, the General Assembly passed H.B. 588, which repealed the prior statute and replaced it with a version that still permitted the use of a CRP to consider whether to forcibly medicate a mentally ill person confined to a state-run facility who refused to be medicated, by notifying the person of the location, time, and date that the panel will convene, to be present, ask questions, present witnesses, and ask the assistance of a lay-advisor. In short, the 1991 version of HG § 10-708 provided an array of due process rights previously not afforded a mentally ill patient confined to a state facility.

Under the current version of the statute, the determination to involuntarily medicate a resident at a state-run facility may only be made if the notice requirements delineated in

HG § 10-708 (d)(1-2) [26] and (e)(1-3)[27] are met.  Afterward, the panel may approve the

administration of medication if:

(1) The medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder;

(2) The administration of medication represents a reasonable exercise of professional judgment; and

(3) Without the medication, the individual is at substantial risk of continued hospitalization because of:

[26] (d)(1) The chief executive officer of the facility or the chief executive officer's designee shall give the individual and the lay advisor written notice at least 24 hours prior to convening a panel.
(2) Except in an emergency under subsection (b)(1) of this section, medication or medications being refused may not be administered to an individual prior to the decision of the panel. MD. CODE ANN., HEALTH-GEN. § 10-708 (d)(1-2)

[27] (e)(1) The notice under subsection (d)(1) of this section shall include the following information:
(i) The date, time, and location that the panel will convene;
(ii) The purpose of the panel; and
(iii) A complete description of the rights of an individual under paragraph (2) of this subsection.
(2) At a panel, an individual has the following rights:
(i) To attend the meeting of the panel, excluding the discussion conducted to arrive at a decision;
(ii) To present information, including witnesses;
(iii) To ask questions of any person presenting information to the panel;
(iv) To request assistance from a lay advisor; and
(v) To be informed of:
1. The name, address, and telephone number of the lay advisor;
2. The individual's diagnosis; and
3. An explanation of the clinical need for the medication or medications, including potential side effects, and material risks and benefits of taking or refusing the medication.
(3) The chairperson of the panel may:
(i) Postpone or continue the panel for good cause, for a reasonable time; and
(ii) Take appropriate measures necessary to conduct the panel in an orderly manner.

(i) Remaining seriously mentally ill with no significant relief of the mental illness symptoms that:
 1. Cause the individual to be a danger to the individual or others while in the hospital;
 2. Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or
 3. Would cause the individual to be a danger to the individual or others if released from the hospital;

(ii) Remaining seriously mentally ill for a significantly longer period of time with the mental illness symptoms that:
 1. Cause the individual to be a danger to the individual or to others while in the hospital;
 2. Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or
 3. Would cause the individual to be a danger to the individual or others if released from the hospital; or

(iii) Relapsing into a condition in which the individual is unable to provide for the individual's essential human needs of health or safety.

HG § 10-708(g). As previously noted, HG § 10-708(n)(1), mandates that the approval is valid for a maximum of 90 days. And HG § 10-708(n)(2)(i) requires the CRP can meet after the expiration of the 90 days to renew the approval.

The Court of Appeals has determined that HG § 10-708 is not unconstitutional on its face. *Allmond v. Department of Health and Mental Hygiene*, 448 Md. 592 (2016). However, in *Allmond*, the Court held that compliance with substantive due process rights meant that authorization for involuntary medication may only be constitutionally carried out when there exists an "overriding justification," such as a need to render a pretrial detainee competent for trial. *Id*. at 596.

While Perkins' use of the CRP provides Meddings with due process protections, its regular use seemingly comes at a price, which, arguably in Meddings' case, would not be consistent with his long-term best interests. This may be so for the following reasons. *First*, Meddings has consistently and adamantly refused to take not only his anti-psychotic medication, but also his somatic medication. The CRP had been convened three times during the first eight months that Meddings had been at Perkins, meaning that the CRP had to be used every month Meddings was there.[28] Even with these regular interventions Meddings remains actively psychotic and a danger to himself and others. Doctors Htwe and Patel recounted a half-dozen violent episodes where others faced risk of significant injury at Meddings' hands. The incidents at the nurses' stations, particularly the incident at the Baltimore V. A. Hospital, were extremely violent.

A parallel concern is that between the second and third renewals of the CRP, Perkins could not form a new panel in time to renew Meddings' psychotropic medications. According to Dr. Htwe, Meddings went without medication for a few days and "he was really out of control." To paraphrase Dr. Htwe, the doctors at Perkins "learned the hard way" that the CRP was not a reliable means to address Meddings' adamant refusal to take psychotropic medication.

*Second*, because the evidence at trial showed that Meddings will not willingly take anti-psychotic medication, it seems certain that Perkins will have to employ the CRP

---

[28] August 2017 to April 2018.

procedure throughout Meddings' confinement there (or at another DHMH facility). At age 68, still "floridly psychotic," and without "immediate plans to discharge him," it is very likely that Meddings will require routine 90-day CRP interventions for the foreseeable future.

*Third*, Dr. Htwe testified that the use of the CRP undermines his relationship with Meddings. Dr. Patel also testified that Dr. Htwe's relationship with Meddings suffered as a result of the adversarial nature of the CRP proceedings. If improving Meddings' mental health is a realistic goal, then it does not seem that the regular use of the CRP helps achieve this. Indeed, based on the uncontradicted testimony of two psychiatrists, the habitual use of the CRP seems to undermine the doctor-patient relationship by creating an ever-widening fissure between doctor and patient.

*Fourth*, the use of the CRP does not address Meddings' heart problems. Dr. Htwe testified that without medical intervention, specifically a means to forcibly administer medication to combat atrial fibrillation, Meddings risks having a heart attack or stroke, either of which could be fatal. In addition to taking somatic medication, Dr. Htwe testified that Meddings requires significant medical intervention including an electrocardiogram and "a follow-up with a heart specialist." The evidence adduced at trial revealed that the CRP cannot help Meddings with any of these medical needs. We cannot find that the court committed clear error in rejecting the long-term use of the CRP in favor of guardianship.

Based on these considerations, we do not conclude the circuit court committed clear error in any of its factual findings. The circuit court's decision to appoint a guardian for Meddings, finding that it was the least restrictive alternative for him, was within the court's sound discretion. Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**